**In re MODERN STEEL TREATING CO., Debtor.**

**Bankruptcy No. 86 B 03530.**

United States Bankruptcy Court, N.D. Illinois, E.D.

July 23, 1991.

Robert A. Filpi, Stack, Filpi & Kakacek,
Chicago, Ill., for Burton H. Graham.

Jeffrey E. Schiller, Schuyler, Roche & Zwirner, Chicago, Ill., for Freda Graham.

Douglas J. Lipke, Keck, Mahin & Cate, Chicago, Ill., for Modern Steel.

Donald F. Spak, Arvey, Hodes, Costello & Burman, Chicago, Ill., for Drovers Bank.

Richard C. Friedman, Dept. of Justice, U.S. Trustee's Office, Chicago, Ill., for U.S. Trustee.

## MEMORANDUM OPINION

RONALD S. BARLIANT, Bankruptcy Judge.

The Debtor, Modern Steel Treating Co., has moved the Court to modify its confirmed Plan of Reorganization. The Grahams, who are shareholders of the Debtor, as well as holders of unsecured claims, have moved to compel the execution of an agreement referred to in the Plan. The matters were tried before the Court and have been fully argued. These are core matters under 28 U.S.C. § 157(b). All the motions, including the alternative motions to convert or dismiss, are denied.

*Findings of Fact*

The Debtor, Modern Steel, is a corporation engaged in steel processing. The Debtor's holding company is G & G Land, but all the parties ignore this technicality, and consider only Modern Steel. There are three shareholders in the holding company (but they will be discussed as if they were shareholders in the Debtor directly): Burton Graham, 30%, his brother Stanton Graham, 20%, and George Glickley, 50%. Mr. Glickley and his son are the principal officers of the Debtor; the Grahams no longer have a management role. Burton Graham and his wife, Freda, along with Mr. Glickley and his wife Ursula guaranteed a note to Drovers Bank (now Cole Taylor Bank) on which the Debtor was the direct obligor. In 1983, at the insistence of Drovers, the Glickleys and the Grahams became the direct obligors on the Note, while the Debtor became the guarantor. The proceeds were used by Modern Steel. Drovers asserts a security interest in nearly all the Debtor's assets, and in the personal assets of Mr. Glickley and Burton Graham.

When the Debtor's petition was filed, Drover's total claim was approximately $2 million. The indebtedness to Drovers is currently approximately $1.2 million. Part of this reduction is due to the sale of the Grahams' home, yielding $240,000, and the refinancing of Mr. Glickley's home, yielding $500,000, both of which were used to pay down the debt to Drovers.

The Debtor's chapter 11 petition was filed on March 6, 1986, and its Plan of Reorganization was confirmed on October 10, 1989. The Debtor was hurt by two explosions at its premises, the first occurred on September 11, 1989, the second on March 31, 1990. The damage was not fully covered by insurance (although the Debtor continues to assert claims against its carriers) and has made it more difficult for the Debtor to operate and carry out the Plan.

The Debtor's disclosure statement, in the section entitled "General Information," mentions an agreement that the parties were to execute:

> As a result of a shareholder agreement between George B. Glickley, and Burton and Stanton Graham, Glickley will satisfy or assume the personal joint obligations of Graham, which resulted from loans and capital provided to Modern Steel for its operations, including the obligations to the Drovers Bank. Glickley also will pay Graham $1,100 per week on a $375,000 Promissory Note, until certain California real estate, in which Graham and Glickley have an interest, is sold.
>
> ... Burton and Stanton Graham will not be involved in the operations of the business, and will assign their shares in the Debtor, as well as obligations of the Debtor to them, to George B. Glickley, pursuant to a certain shareholder agreement.

This agreement is also referred to in the Plan.

3.7 "Class" [Unsecured claims of Burton, Freda, Stanton Graham] Unsecured Claims shall be impaired. The Class 7 Allowed Claims shall be assigned to George B. Glickley ("Glickley") in con-

sideration of an agreement to be entered into between Glickley and the Class 7 Claimants, for the transfer to George B. Glickley or his assignee of the stock of the Debtor owned or held by respective Class 7 Claimants. After the assignment of such claims to Glickley, the claims shall be treated under this Plan as if such claims are Class 6 Allowed Claims. If, for any reason, the stock of the Debtor held or owned by Class 7 Claimants is not transferred to George B. Glickley or his assignee, the claims of Class 7 Claimants shall not be Allowed Claims.

3.8 "Class 8" [Equity interests] Shareholder Allowed Interests are not impaired, except as noted below. The holders of Class 8 Shareholder allowed Interests shall not receive any payments of cash from the Debtor under this Plan of Reorganization for their shareholder interests but shall retain their shareholder interests; *except that,* in consideration of this Plan and other consideration, the shares of Burton Graham, Stanton Graham, and Freda Graham, if any, shall be subject to a certain agreement to be entered into between Burton Graham, Stanton Graham, Freda Graham and George B. Glickley, for the transfer of all stock, shares and interests of Burton Graham, Stanton Graham and Freda Graham to George B. Glickley.

The only terms of the agreement that can be gleaned from the Disclosure Statement and the Plan of Reorganization are: 1) Mr. Glickley will assume or satisfy certain obligations of the Grahams, 2) Mr. Glickley will pay the Grahams $1,100 per week on a $375,000 Note, 3) Burton and Stanton Graham may assign their shares in the Debtor to Mr. Glickley, but if, for any reason, this assignment does not occur, the unsecured claims of the Grahams will not be allowed. The parties negotiated the terms of the agreement, both before and after confirmation, but failed to reach an accord. In addition, the Debtor's difficulties after the two explosions caused it to re-think the Plan. Now all the parties are before the Court seeking alternate forms of relief.

The Debtor proposes to modify the Plan. For the current Section 3.8, the Debtor would substitute:

3.8 "Class 8" Shareholder Allowed Interests are impaired. All stock and shares of the Debtor held by Class 8 Shareholders shall be cancelled, and the Class 8 Shareholders shall no longer maintain any shareholder interests in the Debtor, except as otherwise provided in the Plan.

The Debtor would also add a new Article IX:

*Shareholders*

A new class of voting common stock ("New Stock") shall be issued by the Debtor, which New Stock, at least initially, shall be the only stock of the Debtor. One hundred percent of the New Stock shall be issued to and held by George B. Glickley.

In other words, all existing stock would be cancelled. A new class of stock would be created, which would be the Debtor's only stock, and it would all be issued to Mr. Glickley.

The Grahams seek another form of relief. They ask the Court to compel the execution of a form of agreement that they have drawn up. That agreement contains a number of terms and stipulations not mentioned in either the Plan or the Disclosure Statement. The Grahams would convey to Mr. Glickley all of their interest in G & G Land, the Debtor's holding company; Mr. Glickley, G & G Land, and the Debtor (assuming Court approval) would deliver a Note to Burton Graham obligating them to pay Graham $468,000 in weekly installments; they would also assume certain obligations incurred by Burton and Freda Graham, including, obligations to Drovers, to the Debtor, to G & G Land, and obligations resulting from another transaction, the Velo, DeSantis Loan; Mr. Glickley would pay half the legal fees incurred by Burton Graham in connection with this bankruptcy; and Burton Graham, Stanton Graham, Freda Graham, George Glickley, Ursula Glickley, the Debtor, and G & G would execute mutual releases. The Debt-

or and Mr. Glickley refuse to sign this document.

*Conclusions of Law*

I.  Motion to Modify the Plan

■ A Plan can only be modified before it is substantially consummated. § 1127(b). Section 1101(2) sets out three conjunctive requirements for substantial consummation. (A) The transfer of all or substantially all of the property proposed by the Plan to be transferred; (B) The assumption by the debtor ... of all or substantially all of the property dealt with by the Plan; and (C) commencement of distribution under the plan. The burden is on the proponent of modification to show that the Plan has not been substantially consummated. *In re Fansal Shoe Corp.*, 119 B.R. 28, 30 (Bkrtcy.S.D.N.Y.1990).

■ In our case, the Debtor continues to manage the property, and distribution has commenced. The second and third requirements of § 1101(2) are met. However, there has not been a transfer of substantially all the property. The property transfer contemplated in this Plan is the transfer of the stock from the Grahams to Mr. Glickley, which has not even commenced. It is true that several cases imply that the property contemplated in § 1101(2)(A) involves only property being transferred "to or from the Debtor." *In re Bedford Springs Hotel*, 99 B.R. 302, 303 (Bkrtcy.W.D.Pa.1989), *In re Hayball Trucking*, 67 B.R. 681, 684 (Bkrtcy. E.D.Mich.1986). If this is the proper interpretation, then the current status of the Graham–Glickley transfer is irrelevant to substantial consummation. However, the Court rejects that interpretation. Although "to or from the Debtor" is used in these cases, this language is not used in the statute itself, and the cases that use this language are not considering transfers not directly involving the Debtor. Under these circumstances, the phrase is inconclusive. This Court's understanding of "transfer of property" as used in § 1101(2) includes the Graham–Glickley transfer. Because that transfer has not begun, the modification is timely. *U.S. v. Novak*, 86 B.R. 625, 630 (D.S.D.1988).

■ A post-confirmation modification must meet the requirements for confirmation. *In re FCX, Inc.*, 853 F.2d 1149, 1156 (4th Cir.1988). Because under the proposed modification the Grahams would lose all their shares while Mr. Glickley would acquire complete ownership, the modification would violate § 1123(a)(4), § 1129(a)(7), and § 1129(b)(1). Section 1129(a)(7) requires that the holder of an impaired claim either accept the plan or receive under the plan at least as much as it would receive in a chapter 7. The Debtor has failed to provide a liquidation analysis, *Matter of Barth*, 83 B.R. 204, 206 (Bkrtcy.D.Conn. 1988), and indeed, it is hard to imagine how this modification could pass such a test. Section 1129(b)(1) states that the Court shall confirm a plan if it does not discriminate unfairly, and is fair and equitable with respect to each impaired class that has not accepted the plan. This, in turn, requires that no equity holder can retain any property if an objecting class of unsecured creditors is not paid in full, § 1129(b)(2)(B)(ii), the absolute priority rule. The Grahams hold impaired claims. Since under the modification Mr. Glickley would continue to hold an equity interest, the modification violates § 1129(b)(2)(B)(ii). Finally, § 1123(a)(4) provides that a plan must provide the same treatment for each claim or interest of a particular class. Although Mr. Glickley and the Grahams are all equity holders (Class 8), Mr. Glickley would, under the modification, obtain the Grahams' shares without any consideration. This is certainly unequal treatment.

■ The Debtor's position is that the modification should be allowed because Mr. Glickley has provided substantial new value to the estate in two forms—the payment to Drovers that resulted from the refinancing of his home, and the ongoing work he performs for the Debtor as its Chief Executive Officer. Recently, the Seventh Circuit has called into serious question the existence of the new value exception to the absolute priority rule. *Kham & Nate's Shoes No. 2 v. First Bank of Whiting*, 908 F.2d 1351, 1362 (7th Cir.1990). However, we need not address that issue. Even if the exception still exists, and even if it

would cure the similar treatment and unfair discrimination problems, it does not apply to this situation. In the first place, new value must be in the form of "money or money's worth." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 967, 99 L.Ed.2d 169 (1988). " 'Sweat equity' is not within the scope of the fresh-capital exception." *Matter of Stegall*, 865 F.2d 140, 142 (7th Cir.1989). Glickley's work as the Debtor's CEO, even assuming it is not fully compensated by his salary and perks, is not money or money's worth. Furthermore, in making the payment to Drovers, Mr. Glickley was paying his own debt. He was, at that point, the direct obligor on the loan, and his payment to Drovers cannot be seen as providing new value to the Debtor. Mr. Glickley may have a remedy in the form of contribution from the co-obligor, but not in the form of plan modification.

■ The Debtor also argues that the Plan should be modified because, for various reasons, it is no longer capable of meeting its obligations under the current Plan. The evidence presented at trial does not wholly support this contention. However, we need not weigh the evidence on this issue because inability to fund the Plan is not a reason for modification under § 1127(b). Further, a confirmed plan is a contract. *In re Page*, 118 B.R. 456, 460 (Bkrtcy.N.D.Tex.1990). The insolvency of the promisor does not discharge the duty to perform under the contract. Corbin on Contacts, § 1332, pp. 362–364. See also *Felbinger and Co. v. Traiforos*, 76 Ill. App.3d 725, 31 Ill.Dec. 906, 912, 394 N.E.2d 1283, 1289 (1979). No amount of financial constraint will, in and of itself, relieve the Debtor of its obligations.

## II. Grahams' Motion to Direct Execution of Instrument

■ The Grahams have moved the Court to direct the execution of the form of agreement that they have drawn up. Section 1142(b) grants the Court the power to direct the Debtor to execute any instrument that is necessary for the consummation of the Plan. However, even under § 1142, the Court cannot compel the execution of a document if there is no agreement on the terms, or if the terms are uncertain. "A contract does not exist [and therefore the Court cannot enforce it] if the essential terms are vague or omitted." *Pearson Bros. Co. Inc. v. Pearson*, 113 B.R. 469, 477 (C.D.Ill.1990). In *United States v. Orr Constr. Co.*, 560 F.2d 765 (7th Cir.1977), the issue was whether an agreement arising out of an earlier contract was sufficiently definite to be enforced by the court. The Seventh Circuit wrote, "In order for such a contract to be enforceable, however, it is necessary that the terms to be agreed upon in the future can be determined independent of a party's mere wish, will, and desire ... either by virtue of the agreement itself or by commercial practice or other usage or custom.... If the language of the contract is too indefinite to permit this determination the court cannot enforce the contract without engaging in the forbidden practice of itself supplying the terms of the agreement which the parties promised to reach in the future." At 769, citations omitted.

■ In our case, the parties have not agreed on the terms contained in the document proposed by the Grahams. Neither the Plan itself, nor usage and custom aid the Court in determining what understanding, if any, the parties had reached. The document the Grahams ask us to require Mr. Glickley and the Debtor to sign contains many conditions and requirements that are not mentioned in either the Plan or the Disclosure Statement, and are not necessary or even helpful to the Plan. Finally, the Plan itself contemplates the possibility that no agreement will ever be reached.

## III. Grahams' Motion to Void Confirmation and for Other Relief

■ The Grahams also suggest alternative remedies. They move that because of the Glickleys' continuing bad faith refusal to carry out individual and corporate obligations under the Plan, the Court remove them from their positions with the Debtor and appoint a chapter 11 trustee. Since we have found that executing the draft agree-

ment was not an obligation under the Plan, we deny that motion. Even if there were bad faith in connection with the Plan, a trustee can only be appointed "before confirmation of a plan." § 1104(a).

Alternatively, the Grahams move the Court to "void confirmation of the Plan on the grounds that it cannot be adhered to," and convert the case to chapter 7. In fact, confirmation can be neither "voided" nor "struck." Confirmation can be "revoked," but only within 180 days, and only for fraud. § 1144. The Grahams' motion was filed more than 180 days after confirmation, and they have made no allegation of fraud during the confirmation process. Similarly, conversion would be of no benefit to the Graham or anyone else because after confirmation the property of the estate vests in the reorganized debtor and the bankruptcy estate ceases to exist. *In re T.S.P. Industries*, 117 B.R. 375 (Bkrtcy.N.D.Ill.1990). Nor has there been adequate notice as required under B.R. 2002(a).

If there are remedies for the predicament in which the parties now find themselves, those remedies lie outside the confines of this case.

> Once the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval. The firm also is without the *protection* of the bankruptcy court. It may not come running to the bankruptcy judge every time something unpleasant happens.

*Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir.1991).

For the reasons explained above, all motions in this matter will be denied.