**In re EDDINGTON THREAD MANUFACTURING CO., INC., Debtor.**

**Bankruptcy No. 92–23608 SR.**

United States Bankruptcy Court, E.D. Pennsylvania.

May 17, 1995.

Mark J. Packel, Duane, Morris & Heckscher, Philadelphia, PA.

Dennis Helf, Grim, Biehn, Thatcher & Helf, Quakertown, PA.

Allen B. Dubroff, Astor Weiss Kaplan & Rosenblum, Philadelphia, PA.

Kevin P. Callahan, Office of U.S. Trustee, Philadelphia, PA.

Lewis H. Gold, Adelman Lavine Gold and Levin, Philadelphia, PA.

Pace Reich, Clark, Ladner, Fortenbaugh & Young, Philadelphia, PA.

Regina Stango Kelbon, Blank, Rome, Comisky & McCauley, Philadelphia, PA.

Lynne P. Fox, Amalgamated Clothing and Textile Workers Union, Philadelphia, PA.

David S. Hope, Stradley Ronon Stevens & Young, Philadelphia, PA.

### OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

### Introduction.

Max Berger ("Berger") and Irving Tannenbaum ("I. Tannenbaum"), sometimes collectively referred to herein as the "Plan Proponents," are before the Court seeking confirmation under Bankruptcy Code Section 1129(b) of their Modified Second Amended Plan of Reorganization (the "Plan") for the above Chapter 11 debtor, Eddington Thread Manufacturing Co., Inc., (the "Debtor"). Confirmation is supported by the Official Committee of Unsecured Creditors (the "Committee"), as well as by the Debtor's principal secured creditor, Corestates Bank, N.A., formerly known as Bucks County Bank & Trust Co. (the "Bank"). Confirmation is opposed by unsecured creditor Herman Tannenbaum ("H. Tannenbaum"), and equity interest holder Sylvia Teich ("Teich"), sometimes collectively referred to herein as the "Objectors." Hearings to consider confirmation of the Plan were held on March 29, 1995 and April 6, 1995. On the basis of the record presented, and after consideration of the arguments of the parties as expressed in post-hearing memoranda of law, the Plan will be confirmed.

### Background.

The Debtor is a closely held corporation which manufactures thread and pre-wound bobbins. The present shareholders of the Debtor are Plan Proponents Berger and I.

Tannenbaum, along with Martin Tannenbaum and Teich. The Debtor operates currently at plants located in Bensalem, Pennsylvania and Worcester, Massachusetts and employs approximately 100 people. The Debtor rents both of its plants. The Massachusetts facility is leased from an unrelated entity, however, the Debtor's Bensalem operation is conducted in premises owned by the Eddington Thread Manufacturing Company, a Partnership (the "Bensalem Landlord"), an entity owned in part by Plan Proponent I. Tannenbaum. Both realty leases were "deemed" rejected during the pendency of this Chapter 11 case, although the Plan Proponents' Second Amended Disclosure Statement (the "Disclosure Statement") recites the Plan Proponents' belief that they will be able to enter into satisfactory new leases with each Landlord.

The Debtor's present financial difficulties stem from a steady decline in its revenues from a high of $8,384,491 for the period ended September 30, 1990 to just under $5,000,000 for the period ended September 12, 1992. In this respect, the Disclosure Statement recites that "decreased gross revenues resulted in a loss in profitability in 1992 which triggered the loan defaults and subsequent Chapter 11 filing." (On September 19, 1992).

The Debtor's assets consist primarily of accounts receivable, inventory, and equipment having an alleged aggregate fair market value, as of August 31, 1994, of $3,100,-000, and a liquidation value on the same date of $1,322,600.[1] The Debtor's liabilities consist of the Bank's secured claim (encumbering all assets) in the approximate amount of $680,000, unpaid post-petition payables of approximately $760,000, other Chapter 11 administrative expenses of approximately $60,-000 and general pre-petition unsecured claims (per the Debtor's Schedules) of approximately $950,000.[2]

The Plan now before the Court follows lengthy and oft times acrimonious competition among the Plan Proponents and the Objectors over the right to control the future affairs of the Debtor. In this respect, the Court notes an apparent inter-generational dispute among the members of the Tannenbaum family, with Plan Proponents Berger and I. Tannenbaum, along with Martin Tannenbaum and Linda Liebman aligned on one side, versus Teich and her nephew, unsecured creditor, H. Tannenbaum, aligned on the other side.

Since the commencement of this Chapter 11 case, the Debtor has filed no less than four proposed reorganization plans. H. Tannenbaum has likewise filed two. The most recent H. Tannenbaum reorganization plan, which had proposed a 35 cent dividend to unsecured creditors, had in fact proceeded to the point of a confirmation hearing in May 1994. That confirmation hearing was canceled after the Court approved a request by two unsecured creditors to change their vote and reject the H. Tannenbaum Plan. This request was prompted by indications from the Debtor that it was prepared to offer a higher dividend to general unsecured credi-

1. The Debtor also possesses certain alleged causes of action which were first mentioned and "reserved" by the Debtor in a supplement to the Disclosure State approved by the Court on March 30, 1995, over the objection of H. Tannenbaum and Teich. These causes of action, as described in the Supplement, lie against various defendants including H. Tannenbaum, Leonard and Sheldon Teich, and others and are based on various tort theories. Disclosure and reservation of these causes of action late in this case was apparently prompted entirely by the opinion of Judge Diane Weiss Sigmund of this Court in *H & L Developers, Inc. v. Arvida/JMB Partners (In re H & L Developers, Inc.)*, 178 B.R. 71 (Bankr.E.D.Pa. 1994), wherein Judge Sigmund construed the Third Circuit Court of Appeals decision in *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414 (3d Cir.), *cert. denied,* 488 U.S. 967, 109

S.Ct. 495, 102 L.Ed.2d 532 (1988) to bar the post-confirmation prosecution of certain causes of action not been previously disclosed at the time of Plan confirmation. From discussions with the parties at the confirmation hearing, it is readily apparent that neither the Debtors nor the Plan Proponents view these causes of action as possessing significant value, nor for that matter does the Committee. Under these circumstances, the causes of action do not figure further in these proceedings.

2. On the basis of the foregoing, the Plan Proponents argue, *inter alia,* that a forced liquidation would yield no dividend to the holders of unsecured claims, and that the Plan therefore satisfies the best interest of creditors test under 11 U.S.C. § 1129(a)(7)(A)(ii).

tors in a yet to be filed amendment to its then pending plan. The vote change left H. Tannenbaum with insufficient votes to attain confirmation of his Plan. The proposed higher dividend to unsecured creditors (45 cents) is a feature of the instant Plan of the Plan Proponents.

Certain questionable events occurred during the pendency of this Chapter 11 case which warrant mention. Most notable among these is the Debtor's relationship with an entity known as Eastwood Yarn Corporation, ("Eastwood"). The Debtor and Eastwood have a substantial and apparently symbiotic business relationship pursuant to which yarn owned by Eastwood is shipped in its raw state to the Debtor's facilities, where it is then either processed by the Debtor and sold to Eastwood's customers, or purchased by the Debtor for processing and sale to its own customers. These transactions could and historically did result in accounts payable being owed by the Debtor to Eastwood. In a mix-up, attributed by the Debtor basically to inadvertence by the Debtor and/or its accountant, a large volume of transactions with Eastwood (in the net negative amount of $579,969.99) went unrecorded over a period of almost one year during the Chapter 11 case. The consequence of this in the year it was discovered and given effect, via amended operating reports, was to convert the Debtor's then modest operating profit to a substantial operating loss, and to in turn increase its cumulative net deficit from approximately $5,000 to approximately $505,000.

Other disturbing facts included 1) the Debtor's retention of Berger as its Chief Operating Officer during the pendency of this case without prior Court approval and 2) the Debtor's post-petition procurement of certain outside accounting services, apparently without full disclosure of the accountant's separate ties to the Plan Proponents and/or creditor entities affiliated with the Plan Proponents.

The Plan now before the Court establishes the following five classes in addition to claims of administration:

**Class A.** Secured Claim of the Bank.
**Class B.** Secured Claim of Linda Liebman

**Class C.** General Unsecured Claims
**Class D.** Unsecured claims of the 1) Bensalem Landlord, 2) I. Tannenbaum, individually and 3) Eastwood Yarn.
**Class E.** Interest Holders

The proposed treatment of the aforesaid classes under the Plan may be summarized, as follows:

i) **Secured Claim of the Bank.**

Payment of $18,000 per month with a final "balloon" payment of all outstanding principal, interest and expenses on December 31, 1996.

ii) **Secured Claim of Linda Liebman.**

Total payment of $43,531.51 in twelve (12) equal installments payable every four (4) months.

iii) **General Unsecured Claims**

Payment of 45% cash dividend on effective date, or 20% cash dividend on effective date with additional 50% cash dividend payable in monthly installments commencing four months after effective date and payable every fourth month thereafter.

iv) **Bensalem Landlord, I. Tannenbaum and Eastwood Yarn.**

The Bensalem Landlord holds a pre-petition rent claim in the amount of $50,958, I. Tannenbaum holds a claim for unsecured loans to the Debtor in the sum of $302,578, Eastwood Yarn holds a pre-petition unsecured trade claim in the amount of $88,433.06. All three claims are to be paid under the Plan in twelve (12) equal installments payable every four (4) months commencing on the fourth month anniversary of the effective date.

v) **Stockholder Interests.**

Extinguished under the Plan.

Administrative claims are to be paid at or about the time of confirmation of the Plan with the exception of the large ($579,868.99) post-petition payable to Eastwood which is to

be paid in twelve equal installments, payable every four months commencing on the four month anniversary of the effective date of the Plan.

The Plan Proponents estimate that cash in the amount of $215,000 will be necessary to make payments on the effective date, after giving due consideration to the elections of general unsecured creditors in Class C. On this point, Berger testified at the Confirmation Hearing that the source of the $250,000 in funds necessary for the payments due on the Plan's effective date, plus a small working capital infusion for the reorganized Debtor, will be $100,000 which Berger personally has on hand, and an additional $150,000 which he intends to borrow from National Penn Bank. In this respect, Berger intends to loan one-half of the foregoing $250,000 to I. Tannenbaum. The two, in turn, then propose to *loan* the entire $250,000 to the Debtor. With respect to the National Penn Bank loan, Thomas Doyle, a community banking relationship manager for National Penn Bank testified at the Confirmation Hearing as to that Bank's willingness to loan Berger the funds in question. A fully executed copy of a commitment letter for the proposed loan from National Penn Bank was also introduced by the Plan Proponents as Exhibit P-1.

In connection with the issue of the Plan Proponents ability to make payments to claimants which come due under the Plan over time, the Plan Proponents at the Confirmation Hearing offered a set of cash flow projections. (Exhibit P–4). Based on these projections, it is clear that there will be a shortfall in the cash needed by the reorganized debtor to make all of the post-effective date payments contemplated under the Plan. Berger testified that the projections were conservatively prepared and that he, in fact, anticipates that the Debtor's operating results will exceed the projections. Notwithstanding, to deal with the projected shortfall, the Plan at paragraph 5.2, as amended, provides for a prioritization of payments as among the creditor classes. Generally, the prioritization schedule subordinates the distribution rights of creditors in Classes B and D, as well as the administrative expense claim of Eastwood, to the claims of the Class A creditor (the Bank) and the Class C creditors (general unsecured claims). In this respect, Berger testified that, as he interprets his projections, there will never come a point in time when the cash flow available to the Debtor from operations will be insufficient to make the future installment payments due to the Class A and Class C creditors under the Plan.

The Plan proposes the extinguishment of the interests of the Debtor's existing shareholders. The new stock of the reorganized Debtor is to be divided equally between the Plan Proponents, Berger and I. Tannenbaum.

All creditor classes have voted unanimously or overwhelmingly to accept the terms of the Plan, including its subordination provisions as set forth in the aforementioned funding prioritization schedule.

As noted, the lone Objectors to confirmation are H. Tannenbaum, who became a member of Class C by virtue of his postpetition purchase of a small unsecured claim, and existing shareholder Teich, whose class is deemed to have rejected the plan under 11 U.S.C. § 1126(g).

■ At the outset, the Plan Proponents have articulated a challenge to the good faith and/or standing of the Objectors to advance the plethora of objections they assert. In this respect, the Plan Proponents stress that H. Tannenbaum has become a creditor of the Debtor through the allegedly contrived means of purchasing a small ($139) unsecured claim. The Plan Proponents argue that, in reality, H. Tannenbaum is engaged in a business which competes with the Debtor, thereby rendering his motivation tainted and his arguments, at a minimum, suspect. The Plan Proponents argue further that at this juncture Teich should not be heard to complain over the extinguishment of her equity interest under the Plan, inasmuch as the very same treatment was provided for equity interests under the Reorganization Plan previously put forth by H. Tannenbaum, a plan to which she voiced no objection. The Court notes that these arguments are not without a degree of appeal.

In response, however, the Objectors argue that their motivations are irrelevant because this Court has an independent duty to determine whether a reorganization plan meets the confirmation requirements of 11 U.S.C. § 1129. For this reason, the Objectors argue that the Court is obligated to consider all of the objections they have advanced irrespective of their good faith or considerations of standing. In this respect, the Objectors have the better part of the argument. In *In re Zaleha*, 162 B.R. 309 (Bankr.D.Idaho 1993), the Court confirmed this very point in similar circumstances where a creditor's standing was predicated on the post-petition acquisition of a claim. The Court in *Zaleha* proceeded therein to consider the objections advanced by the creditor. In doing so the Court noted, in particular, that the creditor's objections were on their face colorable, as opposed to frivolous. In the contentious setting of the instant Chapter 11 case, this Court is similarly not prepared to characterize the objections lodged by H. Tannenbaum and Teich as frivolous. The Court will therefore proceed to consider the objections *seriatim*. The foregoing approach, the Court notes, is consistent with the weight of authority as articulated in similar decisions reached in numerous circuits throughout the country. *See In re Agawam Creative Marketing Associates, Inc.*, 63 B.R. 612 (Bankr.D.Mass. 1986); *In re Valley Park Group, Inc.*, 96 B.R. 16 (Bankr.N.D.N.Y.1989); *In re Prudential Energy Co.*, 58 B.R. 857 (Bankr. S.D.N.Y.1986); *In re Friese*, 103 B.R. 90 (Bankr.S.D.N.Y.1989); *In re Hoosier Hi–Reach, Inc.*, 64 B.R. 34 (Bankr.S.D.Ind.1986); *In Re Moore*, 81 B.R. 513 (Bankr.S.D.Iowa 1988); *In re Mid Pacific Airlines, Inc.*, 110 B.R. 489 (Bankr.D.Haw.1990).

## Discussion.

### A. *Feasibility*

■ The objectors argue that the Plan fails to meet the requirements of 11 U.S.C. § 1129(a)(11), sometimes known as the "Feasibility" requirement. 11 U.S.C. § 1129(a)(11) provides that the Court shall confirm a Plan only if:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor, or any successor to the debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

In this instance, the Objectors argue that the Plan before the Court fails to meet the above requirement because it does not provide an adequate means for its own implementation under 11 U.S.C. § 1123(a)(5). The Objectors base this conclusion on the fact that the cash flow projections of the Debtor demonstrate that the reorganized debtor cannot make the payments required under the Plan. Moreover, the Objectors stress that there was no evidence offered as to the Plan Proponents' ability to secure the refinancing which will be needed to make the balloon payment to the Bank that comes due in December 1996. The Objectors cite the Court to *Matter of Sound Radio, Inc.*, 103 B.R. 521, 522–23 (Bankr.D.N.J.1989), *aff'd*, 908 F.2d 964 (3d Cir.1989); *In re Brisco Enterprises Limited, II*, 138 B.R. 795, 805–06 (N.D.Tex.1992), *reversed*, 994 F.2d 1160 (5th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993); and *In re Merrimack Valley Oil Co., Inc.*, 32 B.R. 485, 487–88 (Bankr.D.Mass.1983), for the proposition that a proposed Chapter 11 plan, to be feasible, must reflect an ability of the Debtor to make all payments under the plan and thereby provide reasonable assurance that the Debtor will remain commercially viable for a reasonable time after plan confirmation. The Objectors argue that in view of the projected cash flow deficiency the instant plan is no more than a nebulous adventure. *See New Jersey Bank, N.A. v. Oakland Shopping Plaza*, 25 B.R. 311, 312 (D.N.J. 1982). The Objectors further urge that the Court should require the Plan Proponents to demonstrate that the refinancing they need in 1996 is "clearly in sight." *See Matter of K.C. Marsh Company, Inc.*, 12 B.R. 401, 403 (Bankr.D.Mass.1981). Without these assurances, the Objectors argue, the instant plan is not feasible. *See Matter of Cook*, 69 B.R. 235, 237 (Bankr.W.D.Mo.1986), *aff'd*, 72 B.R. 976 (W.D.Mo.1987).

■ As with many provisions of the Bankruptcy Code, the statutory language articulating the feasibility requirement is sufficiently broad so as to have provided a great

deal of latitude to Courts interpreting its provisions. Thus, in contrast to the decisions upon which the Objectors rely, the Plan Proponents point to decisions the language of which underscores that a reorganization plan, to be feasible, need not include a guarantee of success. Rather, a plan satisfies 11 U.S.C. § 1129(a)(11) so long as there is a reasonable prospect for success and a reasonable assurance that the proponents can comply with the terms of the plan. *See Federal Home Loan Mortgage Corp. v. Bugg (In re Bugg),* 172 B.R. 781 (E.D.Pa.1994); *In re Sound Radio, supra; In re Brisco, supra; In re Orlando Investors, L.P.,* 103 B.R. 593 (Bankr.E.D.Pa. 1989). At bottom, it is clear that the feasibility inquiry is peculiarly fact intensive and requires a case by case analysis, using as a backdrop the relatively broad parameters articulated in the statute. In this respect, however, it is clear that there is a relatively low threshold of proof necessary to satisfy the feasibility requirement. *Matter of Briscoe Interprises, Ltd., II,* 994 F.2d at 1166. (The Bankruptcy Judge must simply find that the proposed plan provides a reasonable assurance of commercial viability by a preponderance of the evidence.)

In this instance, the Court concludes that this relatively low threshold has been met by the Plan Proponents, albeit by a small margin. The projections offered by the Plan Proponents satisfactorily demonstrate that the reorganized debtor will be in a position to make the only post-effective date payments it must absolutely make; to wit: those to the Class A and Class C creditors. The remaining payments can be postponed in accordance with the funding prioritization schedule. Full disclosure of this issue has been given and the creditors in those classes subject to either a postponement in payment and/or a subordination have, in voting to accept the Plan, already taken into account the likely cash flow shortages which will be experienced by the Debtor. The thrust of the objectors' arguments, *vis a vis,* the Plan's feasibility is seriously blunted by this fact.

■ The Court, likewise, does not view as fatal to the Plan the absence of a present guaranty as to the availability of refinancing which comes due over eighteen months into the future. Indeed, the lead time involved here is sufficiently extended that it is perhaps unreasonable to expect that any such evidence could or should be produced at the present time. Suffice it also to say that any such requirement in the context of the feasibility analysis under Bankruptcy Code Section 1129(a)(9) would severely tax the ability of many struggling entities to successfully emerge from Chapter 11.

For all of the foregoing reasons, the Objectors' objections to confirmation of the Plan, to the extent predicated on a lack of feasibility, are denied.

**B. *Classification of Unsecured Claims***

■ The next aspect of the Plan to which the Objectors object relates to the inclusion of unsecured creditors in two separate classes i.e., Class C and Class D. The Objectors argue that the claimants in Classes C and D are similarly situated creditors such that they should be included together in a single class. Failure to do so, the Objectors urge, constitutes impermissible discrimination in violation of 11 U.S.C. § 1123(a)(4). In support of its position, the Objectors cite the Court to *Piedmont Associates v. Cigna Property and Casualty Insurance Co.,* 132 B.R. 75, 78 (N.D.Ga.1991); *Matter of Greystone III Joint Venture,* 995 F.2d 1274, 1277 (5th Cir.1991) *on rehearing and suggestion for rehearing en banc, cert. denied, Greystone III Joint Venture v. Phoenix Mutual Life Insurance Co.,* — U.S. —, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992), which cases do stand for the proposition that, absent a valid business justification, similarly situated creditors must be classified together in a Plan of Reorganization. The Objectors observe accurately that the proponent of a Chapter 11 Plan bears the burden of proving a reasonable basis in the event that a Plan discriminates in its treatment of creditors holding similar claims. *In re Richard Buick Inc.,* 126 B.R. 840, 852 (Bankr.E.D.Pa.1991).

■ The Objectors' legal argument is sound, however, its factual underpinning is flawed. The Objectors state in conclusory fashion that no reasonable basis has been asserted by the Plan Proponents for the separate classification of claimants in Classes C

and D. The Court disagrees. The Plan Proponents argue persuasively that the Debtor's future shortfall in cash flow necessary to fund payments over time (as hereinbefore discussed) required the creation of a separate class of unsecured claimants willing to agree to the potential subordination and postponement of payments as contemplated in the funding prioritization schedule. The Plan Proponents note that neither the Bankruptcy Code nor applicable case law sets forth a bright line test for the inclusion of all claims in a similar class, and that a plan proponent may classify unsecured creditors differently if the differences in classification are in the best interest of creditors, foster reorganization efforts, do not violate the absolute priority rule and do not needlessly increase the number of classes. *See In Matter of Jersey City Medical Center,* 817 F.2d 1055 (3d Cir.1987); *Travelers Insurance Co. v. Bryson Properties XVIII (In re Bryson Properties, XVIII),* 961 F.2d 496, 502 (4th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992); *In re Nerlich,* 72 B.R. 181, 183 (Bankr.D.S.C.1986); *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723, 757 (Bankr.S.D.N.Y.1992); *In re Kliegl Brothers Universal Electric Stage Lighting Co.,* 149 B.R. 306, 308 (Bankr. E.D.N.Y.1992); *In re AG Consultants Grain Division, Inc.,* 77 B.R. 665, 674 (Bankr. N.D.Ind.1987). In this instance, the Court agrees with the Plan Proponents that the foregoing tests are met and that the requisite valid business justification exists for the separate classification of the unsecured claimants in Classes C and D. Accordingly, the Objectors' assertion that the Plan unfairly discriminates between the holders of claims in those classes fails.

### C. *Treatment of Equity Interests*

■ The Objectors next area of concern relates to the Plan's treatment of equity interests. As hereinbefore noted, the Plan provides that the interests of all present shareholders of the Debtor corporation will be extinguished on the effective date of the Plan. Shares in the reorganized debtor are to be owned, one-half each, by the Plan Proponents Berger and I. Tannenbaum. As also hereinbefore noted, both Plan Proponents Berger and I. Tannenbaum are current shareholders of the Debtor. The Objectors argue that because the Plan Proponents will each own equity interests in the Debtor after confirmation of the Plan, while shareholders Teich and Martin Tannenbaum will not, the Plan, again, unfairly discriminates among similarly situated creditors in violation of 11 U.S.C. § 1123(a)(4).

On this score the Objector's note, in particular, that although 70 year old shareholder Martin Teich will own no equity interest in the reorganized Debtor he is to receive continuation, for life, of a $200 weekly payment, in the nature of retirement or disability benefits, which he currently receives from the Debtor. The Objectors argue that because there is no *written* agreement binding the Debtor to make this payment, the Plan Proponents' agreement to continue the payment is in reality a disguised means to purchase Martin Tannenbaum's stock in the Debtor. Thus, the Objectors argue, Teich is the only current shareholder of the Debtor who will receive nothing under the Plan. This latter fact is true, however, the inclusion in the Plan of provisions which call for payments to be made to Martin Tannenbaum do not render the terms of the Plan invalid *per se,* nor does not the existence of these payments obviate the fact that *all* current equity interests are to be extinguished under the Plan. The continuation of payments to Martin Tannenbaum, to the extent they, in fact, represent disability or retirement benefits is not prohibited under the Code. In this respect, the Court notes that no evidence to support the disguised payment theory was offered at the hearing on March 29, 1995. The Court, on the other hand, is reluctant to deny confirmation of the Plan merely on the basis of conjecture.

■ Beyond this, the Objectors argue that the Plan also violates the absolute priority rule as contained in 11 U.S.C. § 1129(b) because the Plan Proponents Berger and I. Tannenbaum, are not contributing "new value" in exchange for the new stock they will receive. In this respect, the Objectors note accurately that the infusion of cash by way of a *loan* generally will not satisfy the new value exception to the absolute priority rule.

*See In re Sovereign Group 1985–27, Ltd.,* 142 B.R. 702, 708–709 (E.D.Pa.1992)

The Objectors' entire argument in this vein, however, seems fundamentally flawed. The Plan does not contemplate a transfer of the stock owned by Martin Tannenbaum and Teich to Berger and I. Tannenbaum. On the contrary, the equity interests of *all* current shareholders are being *extinguished. New* stock is to be issued by the reorganized debtor and it is this stock which is to be distributed to the Plan Proponents. In the opinion of this Court, this scenario defeats the Objectors' unfair discrimination argument, *vis a vis,* 11 U.S.C. 1123(a)(4) of the Bankruptcy Code, and it takes the entire matter beyond the realm of the absolute priority rule and/or the new value exception. On this score, the Objector's cite to *In re Modern Steel Treating Co.,* 25 C.B.C.2d 292, 130 B.R. 60 (Bankr.N.D.Ill.1991), a decision wherein the Bankruptcy Court faced somewhat similar facts, and did a proposed plan modification to extinguish existing equity interests and reissue new stock to a certain shareholder on the basis that this "retention" of an equity interest was not supported by "new value" sufficient to satisfy the absolute priority rule. Leaving aside any discussion of whether the result reached in *In re Modern Steel* was appropriate, this Court does not embrace the reasoning of *In re Modern Steel* which seems simply to disregard the distinction which exists between the *retention* of existing equity under a reorganization plan versus the issuance of new equity, and thereby reads into the Bankruptcy Code a proscription on the formulation of reorganization plans which the plain language of the Code does not contain. The Court notes too, that if the Objectors' argument in this vein were to be accepted, it is doubtful that a subset of a Debtor's existing equity holders could ever attain confirmation of a reorganization plan without the consent of *all* equity holders. Nothing in the Bankruptcy Code suggests that result.

For the foregoing reasons, the Objectors' objection to confirmation of the Plan on the basis of its treatment of equity interest holders will be denied.

### D. *Good Faith*

The next important area of inquiry raised by the Objectors is the good faith of the Plan Proponents. In this respect, 11 U.S.C. 1129(a)(3) provides that a plan may be confirmed only if:

> The plan has been proposed in good faith and not by any means forbidden by law.

The Objectors note correctly that the term good faith is not defined in the Bankruptcy Code. The Objectors direct the Court's attention to *Connell v. Coastal Cable T.V. Inc.,* 709 F.2d 762, 764 (1st Cir.1983) for the proposition that a reorganization plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standard prescribed under the Code. Alternatively, the Objectors point to *In re Orlando Investor L.P.,* 103 B.R. 593, 598 (Bankr.E.D.Pa.1989) wherein the Court noted that while the concept of a good faith plan is not well defined, it is generally viewed as having at least two components; to wit: the Plan must be proposed with honesty and good intentions, and it must be proposed with a basis for expecting that a reorganization can be effected. At the outset, the Court notes that the record before the Court contains no evidence of subjective bad faith on the part of the Plan Proponents. The Objectors argue, nevertheless, that various objective indicia exist. Included among these are the aforedescribed accounting problem involving Eastwood, the Debtor's failure to obtain prior court approval for the retention of Berger as Chief Operating Officer of the Debtor, and the Plan Proponents' relationships with entities which compete and/or do business with the Debtor. As hereinbefore noted, the Court agrees that these matters are troubling, some more so than others. Their existence alone, however, fails to convince the Court that the Plan Proponents are before the Court in bad faith. On the contrary, the Objectors' argument to this effect is simply innuendo. The Objectors, in other words, ask the Court to infer bad faith on the part of the Plan Proponents from the facts to which they allude. While the instant Chapter 11 case has certainly not been a "model" case, the accounting deficiencies and the Debtor's departure from certain

required procedural requirements do not by themselves convince the Court that the Plan Proponents lack either honesty or good intentions with respect to the Reorganization Plan now before the Court. In this regard, the Court notes particularly that all of the matters complained of have been well known not only to the Objectors, but to all other creditors and parties in interest who or which have taken an active role in this case, including the Committee and its counsel. No "non-family" member has attacked the bona fides of the Plan Proponents, nor has anyone felt it incumbent to press concerns in this respect by way of formal motion seeking affirmative relief. While the Court certainly does not countenance any departure on the part of the Debtor and/or the Plan Proponents from the rules of procedure, and while the Court may deplore the lax safeguards which permitted an accounting mistake of the magnitude which occurred in this case, these imperfections by themselves, again, fail to persuade the Court that the Plan Proponents are before it in bad faith. In over ruling this objection, the Court notes also that procedures designed to prevent a repetition of the Eastwood accounting mistake have been implemented by the Debtor and the Plan Proponents, apparently to the satisfaction of creditors of this estate who, with near unanimity, have endorsed the Plan now before the Court.

For all of the foregoing reasons, the Objectors' argument, *vis a vis,* the Plan Proponents' lack of good faith will be rejected.

The foregoing are the principal objections asserted by the Objectors. One remaining objection asserted by the Objectors is minor and unpersuasive and does not alter the Court's conclusion that there are no impediments to confirmation of the Plan. Specifically, the Objectors argue that the Plan fails to comply with 11 U.S.C. § 1123(a)(3) in that it fails to specify the treatment of classes impaired under the Plan. In particular, the Objectors took issue with the terms of the Plan Proponents' funding prioritization schedule as the same was originally contained in the Plan. At the confirmation hearing of March 29, 1995, the Court agreed that the language of the funding prioritization schedule was somewhat ambiguous with respect to the relative priority to be accorded to the payment of current installments versus the payment of postponed installments. The modified statement of the funding prioritization schedule furnished by the Debtor satisfactorily resolved this ambiguity and the Court therefore overrules any objection to the Plan predicated on § 1123(a)(3) of the Bankruptcy Code.

In conclusion, therefore, the Court has determined that the numerous objections to confirmation of the Plan lack merit and that the Plan and Plan Proponents have, by contrast, satisfied the requirements for confirmation under 11 U.S.C. § 1129(b). The Plan accordingly shall be confirmed.