**In re S.A.B.T.C. TOWNHOUSE ASSOCIATION, INC.,**
**Debtor.**

**Bankruptcy No. 89–281–BKC–3P1.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

March 30, 1993.

Karen S. Jennemann, Jacksonville, FL, for debtor.

Janet H. Thurston, Jacksonville, FL, for Marlow Investments and Camelitas Holding Co.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This is a chapter 11 reorganization case and before the Court are the following matters:

1. Debtor's Motion to Designate Vote [of Marlow Investments, N.V. and Carmelitas Holding Company] As Not In Good Faith,

2. Debtor's Amended Objection to Claim of Marlow Investments, N.V. and Carmelitas Holding Company,

3. Confirmation of Debtor's First Amended Plan of Reorganization,

4. Objection to Confirmation of Debtor's First Amended Plan of Reorganization filed by Marlow Investments, N.V. and Carmelitas Holding Company,

5. Debtor's Motion to Cram Down Class 2 Creditors under Debtor's First Amended Plan of Reorganization, and

6. Application for Compensation filed by Mahoney, Adams & Criser, P.A.

Upon the evidence presented, the Court enters the following Findings of Fact and Conclusions of Law:

## Findings of Fact

Debtor, a Florida not-for-profit corporation, is a homeowners' association consisting of the owners of the 121 residential units (the "Members") located at the project known as St. Augustine Beach and Tennis Club in St. Augustine, Florida.

Debtor's actions are governed by Articles of Incorporation, Bylaws, and Declarations of Restrictions which are recorded in the official public records of St. Johns County, Florida, and which act as encumbrances against the project. The Articles provide that every person who holds a record fee simple title to any lot in the project is a voting member of Debtor, receiving one membership and one vote for each lot owned. Debtor is governed by an elected Board of Directors which selects officers responsible for overseeing the operation of Debtor.

Although the Members individually own their residential units, Debtor owns, manages, and controls the common use areas, including roads, parking areas, and a swimming pool complex, for the use and benefit of the Members. Each Member has an easement over the common use areas, guaranteeing the use and enjoyment of the property. Such cross-easements reduce the available and permitted uses of the property.

Other than the common use areas, the only assets that Debtor owns are certain lawn and office equipment which has a minimal value.

Debtor's only income is from monthly assessments it levies on and collects from the Members. The Declarations and Bylaws limit the amount which the directors can assess the Members to the amount necessary to pay normal operating expenses to preserve and maintain the project. In addition, the Declarations permit Debtor to levy a special assessment in very limited circumstances, upon two-thirds vote of the Members, and only for "the cost of any construction, reconstruction, renewal, repair, or replacement of a capital improvement upon the Common Use Areas."

Debtor also maintains certain segregated accounts to act as reserves to pay for necessary capital improvements ("Reserve Accounts"). The funding of the Reserve Accounts is mandatory pursuant to Article VI, Section 6 of the Bylaws. The monies held in the Reserve Accounts may only be used to pay for necessary capital improvements and may be used for no other purpose.

The project was developed and marketed by Marlow, a Netherlands Antilles corporation controlled by Walter Schmitz. Schmitz was both a Member, owning nine units, and a Director of Debtor from 1980 until November 1983. In addition, from 1980 until July 1, 1984, Schmitz managed the Project either directly or through wholly-owned subsidiaries or related affiliates and joint ventures. During the time in which Schmitz managed the project it operated at a financial deficit.

Currently, Schmitz, either individually or through related entities, is involved in managing various timeshare development companies at the project which sell individual weeks of use at a particular unit to consumers on a timeshare basis. Schmitz or his related entities have sold 50 weeks of timeshare use for each of approximately 53 units resulting in approximately 2,500 separate timeshare users.

In July, 1985, Debtor filed suit in the Circuit Court of St. Johns County, Florida, against Marlow and other defendants to recover losses sustained by Debtor as a result of alleged mismanagement and self-dealing by the defendants. Marlow asserted a claim against Debtor to recover money Marlow had paid to satisfy a bank note for Debtor. A jury award was made in favor of Marlow for $273,573.39 and a judgment was entered on June 6, 1988. After a hearing on the fees and cost issues, but prior to the entry of a judgment on those matters, Debtor sought the protection of this Court. The decision to file the Voluntary Chapter 11 petition was made by the Board of Directors without a formal vote of the Members.

Marlow did not record a certified copy of the judgment in the public records of St. Johns County, Florida, and is not a secured creditor of debtor. After the petition date, Marlow assigned its interest in the judgment to Camelitas.

On February 2, 1989, Debtor filed a voluntary petition under chapter 11. Several facts led Debtor to file for reorganization. As of the petition date, Debtor did not have sufficient income to pay its other outstanding, unsecured debts as well as the judgment. Further, due to the restrictions contained in the Declarations, Debtor could not levy a special assessment against the Members to pay the judgment. Moreover, even if Debtor could have assessed the Members, any uniform assessment would not have been possible in light of the fact that Members owned units for varying lengths of time and many purchased units *after* the judgment was entered. The Declarations prohibited any assessment that was not uniform. Finally, the directors considered the adverse impact to the Members if Marlow were permitted to record its judgment. Any collection efforts by Marlow would have left the project without any operating funds and the project would have been forced to close.

As of the petition date, Debtor had no secured debt and had unsecured liabilities exceeding $37,000.00, excluding Marlow's judgment, due to over 29 separate creditors.

In late February, 1990, Debtor and Marlow filed competing Disclosure Statements and Plans of Reorganization. Although neither plan was confirmed, this Court permitted either party to file an amended plan to correct deficiencies outlined at the confirmation hearing.

On January 18, 1991, Debtor filed a First Amended Disclosure Statement and Plan of Reorganization. This Court approved the Amended Disclosure Statement on July 11, 1991. The plan provides for 3 classes of creditors: Class 1—administrative claims, Class 2—unsecured claims, and Class 3—the interests of the Members. Absent an agreement with a particular claimant, the administrative claims are to be paid in full.

Class 2 claims are to be paid pro-rata from an escrow account funded by certain Members. The account contains approximately $30,000.00. In the event the plan is not confirmed, the funds in the account are to be returned to the contributors. Class 3 claimants will receive no distribution under the plan, but retain their interests in the Debtor.

The ballot tabulation shows that no votes were cast by Class 1, Class 2 voted to reject the plan, and Class 3 voted to accept the plan. Accounting for the majority of the unsecured debt, Marlow's negative ballot controlled the vote of Class 2. In fact, Marlow is the only creditor opposing confirmation of the plan.

Debtor has paid all operating expenses incurred since the petition date, other than current expenses and certain professional fees. All payments to the United State Trustee have been made. In addition, Debtor has sufficient funds to make all distributions required under the plan and the income is adequate to preserve and maintain the project on an ongoing basis.

### Conclusions of Law

Section 1129(a)(8) requires that each class must either accept or be unimpaired by the plan. In the instant case, Class 2 is impaired and has not voted to accept the plan.

The failure of a plan to meet the requirements of § 1129(a)(8) is not necessarily a bar to its confirmation. A debtor can circumvent § 1129(a)(8) if the requirements set forth at § 1129(b) are met.

■ Established case law requires that the proponent of the plan prove all of the elements necessary to meet the requirements of § 1129(b) by clear and convincing evidence. *In re MCorp Financial, Inc.,* 137 B.R. 219, 225 (Bankr.S.D.Tex.1992); *In re Tallahassee Associates, L.P.,* 132 B.R. 712, 718 (Bankr.W.D.Pa.1991); *In re Rusty Jones, Inc.,* 110 B.R. 362, 373 (Bankr. N.D.Ill.1990); *In re Future Energy Corp.,* 83 B.R. 470, 481 (Bankr.S.D.Ohio 1988); and *In re Agawam Creative Marketing*

*Associates, Inc.,* 63 B.R. 612, 619 (Bankr. D.Mass.1986).

■■■■ Section 1129(b)(1) requires a proponent of a plan to demonstrate that such plan does not discriminate unfairly and is "fair and equitable" with respect to each impaired rejecting class. The standard for "fair and equitable" encompasses the absolute priority rule, which states:

> (B) With respect to a class of unsecured claims—
>
> > (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
> >
> > (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B). In simple terms, the absolute priority rule requires that the creditors be paid in order of priority and that payment be made in full before lesser interests share in the assets of the reorganized entity. Mowlen and Wuhrman, *The New Value Exception to the Absolute Priority Rule: Is Ahlers the Beginning of the End?,* 93 Com.L.J. 303, No. 3 (Fall 1988).

■■■■ However, Debtor maintains that the new value exception to the absolute priority rule applies in this case. As articulated by the United States Supreme Court in *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), the new value exception permits a junior class claimholder to receive payment or retain property, without full satisfaction of a senior class, to the extent that the junior claimholder pays sufficient "new value." Thus, this Court has held that a plan may be fair and equitable without full payment to senior claimants, "if the junior claimant makes a cash infusion which is necessary and substantial to the debtor." *In re Hendrix,* 131 B.R. 751, 753 (Bankr. M.D.Fla.1991).

This Court has reviewed the judicial opinions and legal scholarship arguing that the "new value exception" does not exist, and

remains unpersuaded to reverse its course. This is especially true in light of the Supreme Court's recent opinion reasserting the significance of bankruptcy practice prior to the passage of the Code:

> When Congress amends the bankruptcy laws, it does not write on a clean slate; furthermore, this Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history.

*Dewsnup v. Timm,* —— U.S. ——, ——, 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992). Following the lead of the Supreme Court, this Court hesitates to read the Code in contravention of pre-Code practice, and accordingly, will not hold that the new value exception has been extinguished.

■■■■ Over the years, the new value exception has evolved. Beginning with and building upon Justice Douglas' opinion in *Los Angeles Lumber, supra,* courts have found several requirements for applying the exception. Concisely stated, the new value must be:

(1) new;

(2) necessary to the reorganization effort;

(3) reasonably equivalent to the interest being received; and

(4) in money or money's worth.

*See, e.g., Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) (future services are not money or money's worth); *In re Potter Material Service, Inc.,* 781 F.2d 99 (7th Cir.1986) (cash and renewed guarantee were sufficient); *In re Sawmill Hydraulics, Inc.,* 72 B.R. 454 (Bankr.C.D.Ill.1987) (value of contribution must be at least equal to or greater than the interest retained); and *In re Marston Enterprises, Inc.,* 13 B.R. 514 (Bankr.E.D.N.Y.1981) (owners must be only source of new capital to be necessary).

Strict adherence to the requirements is important to safeguard against a sham

"new contribution" which would infringe upon the rights of creditors to a debtor's property values. *In re Tallahassee Associates,* 132 B.R. at 718.

The first requirement of the exception is that the contribution must, in fact, be "new." Thus, the existing equity holders must contribute something to the Debtor that does not already belong to the Debtor or to which the Debtor is not already entitled.

In the instant case, Debtor proposes to fund its plan by having its agent "collect all normal monthly payments due from members as well as collect amounts remaining unpaid from the 1983 and 1984 assessments (the "Prior Assessments") of members. Debtor has already collected and deposited approximately $28,000.00 in the escrow account for amounts attributable to unpaid 1983 and 1984 special assessments." (Debtor's First Amended Plan of Reorganization, p. 9). The Plan goes on to state that: "The amounts SABTC expects to receive as a result of these collection efforts is [sic] sufficient to enable SABTC to make all distributions required under the Plan." *Id.*

At the Confirmation Hearing, Debtor introduced evidence that it had collected cash totalling $29,686.00 from fifteen of its members, and that it had turned that cash over its bankruptcy attorney to establish the "Escrow Account" required by the plan:

> 1.19 "Escrow Account" means the segregated, interest bearing account maintained by the law firm of Mahoney, Adams & Criser which consists of certain unpaid assessments collected by SABTC.

(Debtor's First Amended Plan of Reorganization, p. 5)

■ Although the Debtor, through its various officers, agents, directors, and attorneys has attempted to characterize the escrowed funds as a fresh capital infusion or "new value," by labeling the payments from the fifteen contributing members as "voluntary," this Court is not fooled. The Debtor has, in fact, done nothing more than partially collect its accounts receivable (prior unpaid assessments) from those

Members who would pay without having to be sued.

Debtor's director and secretary, Mrs. Isla Holm, testified that she had assisted the Debtor in the collection of the Escrowed funds, and that in so doing, she had approached Members to collect money from them on a voluntary basis. When questioned as to how she determined who to approach about paying, Mrs. Holm explained that some Members had paid the Debtor's 1983 and 1984 assessments, and some had not. She testified that she approached Members who had not paid the earlier assessments and told them that she thought it would be fair if they would pay now to fund the plan.

Based upon the plain language of Debtor's plan and the testimony of Mrs. Holm, the Court finds that Debtor has failed to prove that the money collected by the Debtor to fund the plan, is "new value" from the equity holders.

The second requirement of the "new value exception" is that the contribution must be necessary to the Debtor's reorganization effort. As this Court has noted "The exception provides the debtor with the opportunity to acquire capital necessary to survive." *In re Hendrix,* 131 B.R. at 753. At least one court has held that necessity is shown if the debtor does not have sufficient cash to pay unsecured creditors or needs additional capital to maintain operations. *In re Mortgage Investment Company of El Paso,* 111 B.R. 604 (Bankr. W.D.Tex.1990). In this case, Debtor is a non-profit corporation and produces no income. The testimony clearly demonstrated that Debtor did not have sufficient cash to pay all allowed claims and continue operating. Accordingly, the "new value" contribution escrowed for use under the plan is necessary for an effective reorganization and Debtor has met its burden on this element.

The third requirement of the new value exception is that the contribution must be "reasonably equivalent to the interest being received," a test that has been described as "self-explanatory." *In re Yasparro,* 100 B.R. 91, 99 (Bankr.M.D.Fla.

1989). The comparison is between the contribution and the retained interest—the amount of the allowed unsecured claims is not relevant except, perhaps, as a consideration in determining the going-concern value of the Debtor. *Id.*

Debtor's plan fails to provide any information regarding the aggregate value of the shareholders' retained interest in the reorganized entity, and Debtor failed to introduce any evidence of "reorganization value" at the confirmation hearing. The Debtor argues that the "new value" contributed exceeds the market value of the assets of the Debtor, thus the requirement is satisfied.

Debtor's argument is not sound. The Supreme Court in *Ahlers* explicitly recognized that ownership in a debtor has value that is independent of the market value of the debtor's assets. 485 U.S. at 207–208, 108 S.Ct. at 969. The Court rejected the argument that ownership of an entity with little or no net worth and minimal going-concern value is worthless. *Id.*

The Debtor's ownership interest in the real estate that comprises the common areas illustrates the distinction that the Supreme Court made in *Ahlers* between market value of an asset and the value to an owner of the retention of that asset.

Debtor's real estate appraisal states that the fair market value of the common area real estate is $0.00. That same appraisal, however, finds that the "value in use" of the common areas is $724,000.00. As both of Debtor's expert appraisers testified, the "value in use" of the common areas flows from the common area real estate to the individual unit owners. Both appraisers admitted that the benefit of the common area real estate to each unit owner could be determined by dividing the total value in use ($724,000.00) by the number of units in the Project (121). The result, $5,983.47, is the amount by which each unit's value is enhanced by the common area real estate. Since the value of each unit is enhanced by the Debtor's retention of the real estate, the Members also benefit.

Benefits that are personal to an investor are a factor bearing on the value received by that investor. *In re Creekside Landing, Ltd.,* 140 B.R. 713, 178 (Bankr. M.D.Tenn.1992). In the instant case, the Members retain the $5,983.47 enhancement to their units whether the unit owner makes a "new value" contribution or not. Further, Debtor's list of Members who did contribute indicates that not one of the contributions made approached the $5,983.47 enhancement value.

Based upon the terms of the Debtor's plan and the evidence presented by expert real estate appraisers, the Court finds that Debtor has failed to prove that the "new value" contributed by fifteen (15) of the one hundred twenty one (121) Members is reasonably equivalent to the interest being received.

The final element of the new value exception requires that the contribution be in money or money's worth. This factor is designed to preclude retention of an interest in the debtor based merely on a promise. Instead, the junior claimholder retaining an interest must incur a risk in making the new value contribution. *In re Yasparro,* 100 B.R. at 97.

In the instant case, the proposed "new value" is composed of funds deposited in an escrow account. The funds are presently available and clearly satisfy the final requirement.

## CONCLUSION

Since the Debtor's First Amended Plan of Reorganization violates the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B)(ii) and does not come within the new value exception, this Court finds that the requirements to "cram down" the unsecured creditors have not been met, and the plan cannot be confirmed.

Because Debtor is a not-for-profit "non-moneyed, non-business or non-commercial corporation," under 11 U.S.C. § 1112(c), this case cannot be converted unless the Debtor so requests. Accordingly, this case shall be dismissed.

A separate order denying confirmation and dismissing this case will be entered consistent with these Findings of Fact and Conclusions of Law.

## ORDER DENYING § 1129(B) MOTION, DENYING CONFIRMATION, AND DISMISSING CASE

Upon the evidence presented and the Findings of Fact and Conclusions of Law separately entered, it is

ORDERED:

1. Debtor's Motion to Designate Vote as Not in Good Faith is denied.

2. Debtor's Objection to Claim 1 by Marlow Investments, N.V. is overruled.

3. Based upon the claimant's consent, Debtor's Objection to Claim 2 by Marlow Investments, N.V. is sustained and the claim is disallowed.

4. Debtor's First Amended Plan of Reorganization violates the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B) and does not come within purview of the new value exception.

5. Debtor's § 1129(b) motion regarding the unsecured creditors is denied.

6. Confirmation of Debtor's First Amended Plan of Reorganization is denied.

7. The Application for Fees filed by Mahoney, Adams & Criser is denied as moot.

8. This case is dismissed.