In re SEA GARDEN MOTEL AND APARTMENTS, Debtor.

BERKELEY FEDERAL BANK & TRUST, Appellant,

v.

SEA GARDEN MOTEL AND APARTMENTS, Appellee/Cross–Appellant.

Civ. Nos. 95–4839(GEB), 95–4843(GEB).

United States District Court, D. New Jersey.

Feb. 20, 1996.

---

296

Richard Alan Barkasy, Louis R. Moffa, Jr., Schnader, Harrison, Segal & Lewis, Cherry Hill, NJ, for Chemical Bank and Berkeley Federal Bank & Trust.

Barry Warren Frost, Teich, Groh & Frost, Trenton, NJ, for Sea Garden Motel and Apartments.

## MEMORANDUM OPINION

BROWN, District Judge.

This matter comes before the Court on the appeal of Berkeley Federal Bank and Trust ("Appellant"), as assignee of Chemical Bank ("Chemical"), of two Bankruptcy Court Orders: the August 7, 1995 Order Denying Motion for Relief from the Automatic Stay ("August 7th Order"), and the August 8, 1995 Order Confirming Chapter 11 Plan ("August 8th Order"). The Bankruptcy Court entered both Orders after the August

2, 1995 hearing, wherein the court considered the confirmability of the proposed Plan for Reorganization of the Chapter 11 Debtor, Sea Garden Motel and Apartments ("Debtor" or "Appellee"). For the reasons set forth in the Memorandum Opinion, this Court will vacate the August 7th Order, and will affirm in part, and reverse and remand in part, the August 8th Order.

## I. BACKGROUND

Appellee is a New Jersey partnership that owns and operates a thirty-eight unit motel located in Seaside Heights, New Jersey. *In re Sea Garden Motel and Apartments*, Civ. No. 92–35597 at 16 (Bankr.D.N.J. Aug. 2, 1995) (WHG) ("Bankr.Hearing"). The partnership is comprised of three equal partners: Michael Loundy, Jeffrey Loundy, and their mother, Adele Loundy (collectively, the "Loundys"). *Id.* at 13–14. The Loundy family has operated the Sea Garden Motel since its purchase in 1982. *Id.* at 14. The Sea Garden Motel also contains twenty-four apartments, twenty-one containing two bedrooms and full kitchens. *Id.* at 16.

In late 1987, the Loundy's borrowed $1,050,000.00 from Chemical's predecessor-in-interest, Marine National Bank ("Marine"). Certification of Brian J. Christie ("Christie Cert.") ¶ 2, attached to Appellant's Appendix at 119. To evidence this loan, on or about November 13, 1987, the Loundys executed and delivered to Chemical a Mortgage Note in the original principal amount of $1,050,000.00, bearing an interest at the rate of ten and one-half percent (10.5%) per annum, with payment of all outstanding principal and accrued interest due on or before December 1, 1992. *Id.* ¶ 3; Mortgage Note, attached to Appellant's Appendix as Exh. A. The Note was secured by a Mortgage and Security Agreement dated November 13, 1987, executed in favor of Marine by the Loundys (the "Mortgage"). Christie Cert. ¶ 4. The Mortgage, which was recorded in the office of the Ocean County Clerk on November 24, 1987, is a first mortgage and covers the Motel. *See* Mortgage, attached to Appellant's Appendix as Exh. B. Subsequently, on March 8, 1990, the Note and Mortgage were modified by a Note and

Mortgage Modification Agreement ("Modification Agreement"). *See* Note and Mortgage Modification Agreement, attached to Appellant's Appendix as Exh. C. The Modification Agreement was also recorded in the office of the Ocean County Clerk. Christie Cert. ¶ 7; Modification Agreement at 3.

In 1990, the Debtor defaulted with the payments to Chemical due to cash flow shortfalls, and subsequently filed for protection under Chapter 11 of the Bankruptcy Code on September 2, 1992. Debtor's Disclosure Statement at 3, attached to Appellant's Appendix at 52. The Debtor did not make any payments to Chemical after it filed its Chapter 11 petition. Christie Cert. ¶ 14.

In September 1993, Appellee entered into a renewable annual contract with the Ocean County Board of Social Services, wherein Appellee began leasing its apartments to the county for use by area homeless people ("Social Service Contract"). Debtor's Disclosure Statement at 3; Bankr.Hearing at 54–55. The county places these individuals for stays at the Sea Garden Motel for up to ninety days per visit. Bankr.Hearing at 54–55. The Social Services Contract has had a positive effect on Appellee's annual cash flow, increasing rentals during the off-season and permitting Appellee to have income year-round. Disclosure Statement at 3.

During its Chapter 11 case, the Debtor was unable to generate sufficient cash flow to pay operating expenses. Moreover, the Debtor failed to pay approximately $95,-000.00 in post-petition property taxes and water and sewage charges, *see* Memorandum of Barry W. Frost, dated April 11, 1995, attached to Appellant's Appendix as Exh. D, and failed to submit a plan of reorganization for more than two years. In addition, the Debtor's Disclosure Statement and Plan of Reorganization ("Plan") were not filed until September 15, 1994. Debtor's Disclosure Statement and Plan of Reorganization, attached to Appellant's Appendix at 43–55.

In its Plan, the Debtor bifurcated Appellant's claim into a secured claim and an unsecured claim, each with separate classification and treatment. *Id.* at 43, 50. The Debtor estimated Chemical's secured claim at $650,-000.00, and proposed to pay this claim with

seven percent (7%) interest amortized over twenty-five years with a five-year balloon payment. *Id.* at 54. Thus, the Plan provided for monthly payments of $4,803.00 to Chemical in its cash flow projections. *See* Sea Garden Motel, Projected Revenues and Expenses, attached to Appellant's Appendix at 61–65. The Plan also provided that Chemical had an unsecured claim estimated at $650,000.00, which was to receive a five percent (5%) distribution ($6,500.00) over five years without interest. Debtor's Plan of Reorganization, attached to Appellant's Appendix at 54.

The Plan also provided for payment to the priority tax claimants. *Id.* at 54–55. These included the Borough of Seaside Heights for pre-petition real estate taxes and municipal charges, Betty Simon, Trustee, for redemption of a tax sale certificate, and the State of New Jersey Division of Taxation for sales taxes. *Id.* The Plan estimated the amount owed for pre-petition real estate taxes and municipal charges, including the tax sale certificate, to be $250,000.00, which the Debtor proposed to pay over six years with statutory interest. *Id.* The Plan further provided that the claim of the State of New Jersey, Division of Taxation, of approximately $45,-000.00 would be paid over six years with statutory interest. *Id.*

With regard to the equity holders, the Plan stated that the present partners of the Debtor would each retain their partnership interests after confirmation. The Plan did not reflect that the partners would make any contribution of new value upon confirmation of the Plan. Finally, the Plan proposed to pay all administrative claimants, including the Debtor's counsel and accountant, on the effective date of the plan, unless otherwise agreed by the claimant. *Id.* at 55.

On May 10, 1995, Chemical filed an objection to the Debtor's Plan. *See* Objection of Chemical Bank New Jersey, NA to Debtor's Plan of Reorganization, attached to Appellant's Appendix at 91–94. Chemical also cast a ballot rejecting the Plan as both a Class 1 secured creditor and a Class 3 unsecured creditor. *See* Ballot for Accepting or Rejecting Plan, attached to Appellant's Appendix at 95. Chemical objected to the Plan on several grounds: (1) the Plan did not provide for deferred payments to Chemical with a present value equal to the amount of Chemical's secured claim as required by 11 U.S.C. § 1129(b) because the seven percent (7%) interest rate was too low; (2) the Plan violated the absolute priority rule because the partners of the Debtor proposed to retain their ownership interest in the reorganized Debtor under circumstances where Chemical was not receiving, or retaining on account of its unsecured claim, property with the value, as of the effective date of the plan, equal to the allowed amount of its unsecured claim; and (3) the Plan failed to meet the feasibility requirements of § 1129(a)(11).

On June 30, 1995, Chemical filed a motion for relief from the automatic stay. *See* Notice of Motion of Chemical Bank for Relief from the Automatic Stay, or in the Alternative, for Conversion to Chapter 7, attached to Appellant's Appendix at 115–16. Chemical asserted that it was entitled to relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(2) because there is no equity in the mortgaged premises and the mortgaged premises are not necessary to an effective reorganization. At the July 24, 1995 hearing on Chemical's motion, the Bankruptcy Court continued Chemical's motion until the August 2, 1995 confirmation hearing.

Prior to the confirmation hearing, Betty Simon, Trustee, the holder of a tax sale certificate, cast a ballot rejecting the Plan and filed an objection to the Plan asserting that the Plan was not feasible and was likely to be followed by the liquidation or need for further financial reorganization of the Debtor contrary to the requirements of 11 U.S.C. § 1129(a). *See* Trustee's Objection to Confirmation of Debtor's Plan of Reorganization, attached to Appellant's Appendix, at 160–62.

In response to the Debtor's subpoena, Chemical provided Debtor with a copy of its most recent appraisal of the Motel. Chemical's appraisal indicated that the value of the real and personal property collateral securing the Loundys' obligation to Chemical was $600,000.00. Bankr.Hearing at 2. At the hearing conducted on Chemical's motion for relief from the automatic stay, counsel for the Debtor indicated to the Bankruptcy

Court that the Debtor would amend its Plan to take into account the value of the collateral reflected in Chemical's appraisal.

At the outset of the confirmation hearing, counsel for the Debtor announced several amendments to the Plan. Counsel for the Debtor indicated that the Debtor had reached an agreement with Betty Simon, Trustee, pursuant to which the Trustee consented to change her ballot from a vote rejecting the Plan to a vote accepting the Plan. Pursuant to the arrangement reached with the Trustee, the tax sale certificate holder's claim would be repaid in three years, rather than six years. *Id.* at 4–7.

Debtor's counsel also announced that two of the partners of the Debtor, Jeffrey J. Loundy and Michael Loundy, would be making a combined capital contribution of $75,-000.00 on the effective date of the Plan. The $75,000.00 would be applied toward the payment of approximately $95,000.00 in post-petition real estate taxes and water and sewage charges owed to the Borough of Seaside Heights. These post-petition obligations constitute administrative expenses that are required to be paid on the effective date of the Plan. *Id.* at 5.

Further, Debtor's counsel stated that Chemical's secured claim of approximately $350,000.00 would be repaid at nine and one-half percent (9.5%) interest, rather than the seven percent (7%) set forth in the Plan. The Debtor calculated Chemical's secured claim and water and sewage charges by deducting the alleged amount of unpaid pre-petition real estate taxes (approximately $250,000.00) from the value of Chemical's collateral ($600,000.00). Later in the hearing, to resolve Chemical's continuing objection to the interest rate, the Debtor agreed to again amend the Plan and pay Chemical's secured claim at the ten and one-half percent (10.5%) interest rate contained in the Note. *Id.* at 19.

After the one-day hearing, the Bankruptcy Court confirmed the Debtor's Plan, as amended by the representations made by Debtor's counsel during the hearing, over Chemical's objections. *Id.* at 90. The Bankruptcy Court also advised the Debtor to submit a proposed form of order confirming the Plan under the five-day rule. *Id.* at 90–91. On August 4, 1995, the Debtor mailed a proposed form of Order Confirming Chapter 11 Plan to the Bankruptcy Court. *See* Proposed Form of Order, attached to Appellant's Appendix at 263. On August 8, 1995, Chemical submitted its objections to the Debtor's proposed form of order to the Bankruptcy Court via overnight mail. *Id.* at 268–69. The Bankruptcy Court entered the Debtor's proposed form of order on August 8, 1995, without considering Chemical's objections. *Id.* at 264–67. The proposed Order Confirming Chapter 11 Plan was entered before the expiration of five days from its submission to the Bankruptcy Court. An order denying Chemical's motion for relief from the automatic stay was denied by the Bankruptcy Court on August 7, 1995. *Id.* at 263. Subsequently, Chemical filed a Notice of Appeal of the order denying Chemical's motion for relief from the automatic stay and a Notice of Appeal of the Order Confirming Chapter 11 Plan. *Id.* at 270–74.

## II. DISCUSSION

### A. STANDARD OF REVIEW

■ Bankruptcy Rule 8013 provides in pertinent part: "On an appeal the district court ... may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous...." 11 U.S.C.A. Rule 8013 (West Supp.1995). Thus, where a district court reviews a decision by the bankruptcy court on questions of fact, it applies the "clearly erroneous" standard of review. *In re Reach, McClinton & Co.,* 102 B.R. 381, 386 (D.N.J.), *aff'd,* 893 F.2d 1328 (3d Cir.1989) (citations omitted). A bankruptcy court's conclusions of law are subject to plenary review. *Id.; see also Brown v. Pennsylvania State Employees Credit Union,* 851 F.2d 81, 84 (3d Cir.1988). Where mixed questions of law and fact are presented, the appropriate standard must be applied to each component. *In re Sharon Steel Corp.,* 871 F.2d 1217, 1222 (3d Cir.1989).

## B. Absolute Priority Rule

The absolute priority rule, which is codified at 11 U.S.C. § 1129(b)(2)(B)(i) and (ii), provides that "a dissenting class of unsecured creditors must be provided for in full before any junior class of unsecured creditors can receive or retain any property under a reorganization plan." *See Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988). However, most courts have recognized a so-called "new value exception" to the absolute priority rule. *In re Sovereign Group, 1985–27, Ltd.,* 142 B.R. 702, 708 (E.D.Pa.1992); *In re Wynnefield Manor Assocs., L.P.,* 163 B.R. 53, 56 (Bankr.E.D.Pa.1993). This exception provides that

> where there is an infusion of new capital by the debtor, or by the principals of the debtor, in exchange for their continued retention of the reorganized debtor's property, most courts have acknowledged that the strictness of the requirements of the [absolute priority rule] may be relaxed.

*In re Wynnefield Manor Assocs., L.P.,* 163 B.R. at 56 (citing *Matter of Snyder,* 967 F.2d 1126, 1128–31 (7th Cir.1992)).

To invoke this so-called new value exception to the absolute priority rule, the "qualifying new value contribution must be (1) necessary to the reorganization; (2) in the form of money or money's worth; and (3) reasonably equivalent to the interest retained." *In re Capital Center Equities,* 144 B.R. 262, 268 (Bankr.E.D.Pa.1992) (quoting *Matter of Snyder,* 967 F.2d at 1131). Furthermore, the contribution must be *substantial* and proffered by the Debtor at the outset, *i.e.,* "up front". *Id.* (quoting *Matter of Snyder,* 967 F.2d at 1131) (emphasis added). "A rigorous showing as to these requirements is necessary in order to ensure that a debtor's equity holders do not eviscerate the absolute priority rule by means of contrived infusion." *In re Tallahassee Assocs., L.P.,* 132 B.R. 712, 717 (Bankr.W.D.Pa.1991).

In the present matter, Appellant contends that the Debtor's Plan for Reorganization should not have been confirmed because it violates the absolute priority rule. Specifically, Appellant argues that the Bankruptcy Court erred when it: (1) refused to consider whether the proposed new value contribution was substantial; (2) included contributions made by the Debtor, rather than the partners, in its calculation of amount of the new value contribution to be paid under the Plan; (3) included contributions made by the Debtor prior to the confirmation of the Plan in the amount of the new value being contributed under the Plan; (4) confirmed the Plan despite the fact that Adele Loundy retains an equity interest in the Debtor without making a new value contribution; and (5) found that the partners' new value contribution was reasonably equivalent to the value of the interests that they retained under the Plan. Appellant also argues for the first time in its reply brief that the Bankruptcy Court should not have confirmed the Plan for Reorganization because the Debtor did not demonstrate that the new value contribution was necessary for an effective reorganization. These arguments will be addressed seriatim.

### 1. Substantiality

Appellant first argues that the Bankruptcy Court erred by failing to compare the proposed new value contribution of the partners to the amount of Appellant's unsecured claim, as well as the dividend being paid to Chemical on its unsecured claim, to determine whether the proposed new value contribution was adequate to meet the requirements of the exception. The Bankruptcy Court rejected this argument, stating that the obligation to contribute new value is limited to matching the present value of the interest being retained. Bankr.Hearing at 70–72.

The Bankruptcy Court's refusal to compare the proposed new value contribution to the amount of the unsecured debt was error. Contrary to the Bankruptcy Court's reasoning, "the requirement that a contribution be substantial is independent of the rule that a contribution must be at least equal to the value of the interest retained." *Matter of Snyder,* 967 F.2d at 1130. The substantiality requirement "is derived not from *Los Angeles Lumber*'s third criterion, but from its first—that an infusion of new capital must be necessary to the success of the undertaking. Contributions that are merely nominal,

or gratuitous, token cash infusions proposed primarily to 'buy' cheap financing," will not suffice. *In re Greystone III Joint Venture,* 102 B.R. 560, 575 (Bankr.W.D.Tex.1989), *aff'd,* 127 B.R. 138 (W.D.Tex.1990), *rev'd on other grounds,* 995 F.2d 1274 (5th Cir.1991), *cert. denied,* 506 U.S. 821, 822, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992); *see also Stegall,* 865 F.2d at 144.

 While "[t]here is no mathematical formula for resolving the substantiality issue," *Matter of Snyder,* 967 F.2d at 1131–32, " 'a court must compare the contribution to the total prepetition claims and the amount of the debt to be discharged under the Plan.' " *In re Resorts International, Inc.,* 145 B.R. 412, 483 (Bankr.D.N.J.1990) (quoting *In re Pullman Constr. Indus., Inc.,* 107 B.R. 909, 950 (Bankr.N.D.Ill.1989)). Courts have also taken into consideration whether "creditors will share in the potential growth of the newly capitalized debtor, or whether the shareholder's new equity position will have the potentiality of only benefiting the shareholders under the plan." *Id.* (citing *In re Pullman,* 107 B.R. at 950).

In the present matter, the Bankruptcy Court found that the obligation to contribute new value is limited to matching the present value of the interest being retained. Bankr.Hearing at 71. Therefore, because the Bankruptcy Court failed to consider whether the partners' new value contribution satisfied the substantiality requirement of the new value exception, this Court will reverse this portion of the Bankruptcy Court's August 8th Order and remand for proceedings consistent with this Memorandum Opinion.

### 2. Inclusion of Debtor's Contributions

 Appellant further claims that the Bankruptcy Court erred by including contributions made by the Debtor, rather than the partners, in its calculation of amount of the new value contribution to be paid under the Plan. Specifically, Appellant argues that the $25,000.00 figure from the Debtor's operating account was not a contribution from the partnership and, therefore, should not have been included in the total amount of the new value contribution.

 It is well established that the new value exception to the absolute priority rule will only apply "where the infusion of capital comes from an 'outside' source." *In re Cipparone,* 175 B.R. 643, 645 (Bankr.E.D.Mich. 1994); *see also In re S.A.B.T.C. Townhouse Ass'n, Inc.,* 152 B.R. 1005, 1010 (Bankr. M.D.Fla.1993) ("[T]he existing equity holders must contribute something to the Debtor that does not already belong to the Debtor or to which the Debtor is not already entitled"). However, in the present matter, even Appellee concedes that: "[p]resuming that the $25,000.00 included by the Bankruptcy Court in the new value contribution came directly from Appellee's earnings, such $25,000.00 would not constitute new value under prevailing authority." Appellee's Brief at 15 (citing *In re S.A.B.T.C. Townhouse Ass'n, Inc.,* 152 B.R. 1005 (Bankr.M.D.Fla.1993)). Accordingly, this Court finds that the Bankruptcy Court's inclusion of the $25,000.00 figure in the new value contribution was clearly erroneous and, therefore, this portion of the Bankruptcy Court's August 8th Order must be reversed.

### 3. Inclusion of Contributions Made Prior to Confirmation

 Appellant next asserts that "the Bankruptcy Court's inclusion of the $43,-000.00 in repairs in its calculation of the amount of the new value contribution was improper because the $43,000.00 represents amounts listed on the Debtor's interim financial reports as being expended for repairs and maintenance." Appellant's Reply Brief at 2–3. Moreover, Appellant maintains that "expenditures for repairs made in the year and a half before the confirmation hearing cannot be considered 'fresh.' " *Id.* at 3.

With regard to Appellant's contention that the $43,000.00 spent on repairs was listed on the Debtor's interim financial reports and, therefore, was not capital from an outside source, the Bankruptcy Court found that the Loundy family, rather than the Debtor, expended $43,000.00 for repairs and improvements during the Chapter 11 proceeding. On direct examination, Michael Loundy, a partner of Appellee responsible for day-to-

day operations, testified that both Appellee and the partners expended over $100,000.00 for repairs and improvements to the Sea Garden Motel to maintain the Social Services Contract. Bankr.Hearing at 22, 47–50. Although Michael Loundy could not identify the exact portion of the $100,000.00 that came directly from the partners, he testified that the partners have been putting in money "steadily". *Id.* at 48. Moreover, Appellee's operating reports for only a five-month period, April 1994 through August 1994, reflect the expenditure of $43,000.00 on repairs and improvements. *Id.* at 73–74. Given the sworn and uncontradicted testimony of Michael Loundy and the numbers reflected in the monthly operating reports, the Bankruptcy Court concluded that the Loundy family as partners expended at least $43,000.00 of their own funds for the repairs and maintenance of the property. *Id.* at 74. This Court finds that the Bankruptcy Court's finding was reasonably based on the record as a whole. Accordingly, the Bankruptcy Court properly included the $43,000.00 figure when calculating the Loundy family's new value contribution.

With regard to Appellant's claim that the $43,000.00 in repairs and improvements was not "fresh", this Court notes that a "fresh" contribution is one which "tak[es] place at or before the effective date of the plan, not a contribution in the future." *In re Sovereign Group, 1985–27, Ltd.,* 142 B.R. at 708. The "fresh" requirement is concerned with assuring that equity owners make a contribution which creditors can immediately liquidate if the reorganization plan fails. *See id.* In the present matter, the Loundy family contributed $43,000.00 in repairs and capital improvements prior to the effective date of the Plan. Thus, there is no promise of a contribution in the future. Also, Appellant can liquidate the $43,000.00 immediately upon foreclosure if the reorganization fails because the repairs inure to the benefit of the property. Accordingly, this Court concludes that the Bankruptcy Court's finding that the $43,000.00 contribution was "fresh" was not clearly erroneous.

### 4. *Equity interest of Adele Loundy*

Next, Appellant argues that since only two of the partners, Jeffrey J. Loundy and Michael Loundy, are making new value contributions to the Debtor, the Bankruptcy Court erred by allowing the third partner, Adele Loundy, to retain an equity interest in the Debtor without making a new value contribution herself. Bankr.Hearing at 16–17. In rejecting this argument, however, the Bankruptcy Court stated as follows:

> The partnership—and I don't care whether they get the new value by borrowing it from someone or by having a contribution of the partners. If your theory is correct, then if one partner doesn't contribute, you've just destroyed the debtor because I suspect that there's a partnership agreement. As a matter of fact, under the Uniform Partnership Act, if one of the partners is "kicked out," the partnership's over.
>
> * * * * * *
>
> My understanding of the law is the partnership—I can't care where they get it. They may take it off the money tree in the backyard. It doesn't make any difference. If the partnership is contributing new value, then the partnership may retain its interest. That is my understanding of the new value provisions of the Code under 1129.

Bankr.Hearing at 69.

It is well settled that "all property originally brought into a partnership or subsequently acquired in any way on its behalf is partnership property and, unless a contrary intention appears, property acquired with partnership funds is partnership property." *Fortugno v. Hudson Manure Co.,* 51 N.J.Super. 482, 497, 144 A.2d 207 (App.Div.1958). The record below discloses no evidence of a contrary intent and, in the absence of such evidence, this Court concludes that Jeffrey and Michael Loundy proposed to make the cash infusion on behalf of partnership. Accordingly, the Bankruptcy Court properly found that Adele Loundy may retain her interest in Appellee.

*5. Reasonably Equivalent to Value of Retained Interests*

■ Appellant also argues that the Bankruptcy Court erred by holding that the partners' capital contribution was proportionate to the value of their partnership interest in the reorganized Debtor. Appellant contends that the Bankruptcy Court relied upon the straight liquidation value of Appellee (zero) without considering Appellee's upside potential value as a going concern. However, when rendering its decision, the Bankruptcy Court stated:

> You have a liquidation value that is clearly zero in this case, but you have, if successful, and I agree with you, if successful, you have the opportunity to make money. You have to pay for it.... Would you take 135 cash or the possibility they're going to make a profit of a quarter of a million dollars over the next four years? All of which, of course, if your theory is correct, Counsel, has to go out to creditors anyway.... I think the idea that they would come out with getting their 135 back within four years is beyond their wildest imagination. They're not going to. It's not going to happen. They're going to spend 135 to preserve what they think 5 or 10 or 15 years from now it's going to be worth something....

Bankr.Hearing at 88–89. Thus, contrary to Appellant's assertions, the Bankruptcy Court recognized that Appellee, with a present liquidation value of zero, still possesses value as a going concern. The Bankruptcy Court looked to the potential cash flow over four years as a gauge of the going concern value and compared it to the Loundy family's new value contribution. Moreover, the Bankruptcy Court recognized the possibility that Appellee will increase in value over time if Appellee continues to make its Plan payments. Nevertheless, in light of this Court's conclusion that the Bankruptcy Court erroneously included the $25,000.00 figure from the Debtor's operating account when calculating the amount of the new value contribution, we must remand this issue to the Bankruptcy Court to determine whether the resulting proposed new value is

reasonably equivalent to the interests retained by the Loundy family.

*6. Necessary for Effective Reorganization*

Finally, Appellant argues for the first time in its reply brief that the new value contribution at issue is not necessary to an effective reorganization. Appellant's Reply Brief at 11. Specifically, Appellant contends that a new value contribution that is merely used to pay administrative expenses is not necessary to the reorganization of the Debtor. *Id.* (citing *In re Tucson Self–Storage, Inc.,* 166 B.R. 892, 899 (9th Cir. BAP 1994)). Moreover, Appellant maintains that the partners' new value contribution is not necessary to a successful reorganization because Chemical has been left without an equity cushion. *Id.* at 12. However, since this issue was not raised before the Bankruptcy Court, this claim is not properly before this Court on appeal. *See State of New Jersey Dept. of Environmental Protection v. North American Products Acquisition Corp.,* 137 B.R. 8, 13 (D.N.J.1992).

### C. FEASIBILITY

■ In order for a plan of reorganization to be confirmed, the Bankruptcy Court must make a determination that the confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor. 11 U.S.C. § 1129(a)(11). The purpose of this section of the Code is to "prevent confirmation of visionary schemes which promise creditors more under a proposed plan than that which the debtor can possibly attain after confirmation." *In re Trails's End Lodge, Inc.,* 54 B.R. 898, 903–04 (Bankr.D.Vt. 1985). However, the feasibility requirement does not demand a guarantee of success either. *See Matter of Briscoe Enterprises, Ltd.,* 994 F.2d 1160 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993) (citations omitted). As with many provisions of the Bankruptcy Code,

> the statutory language articulating the feasibility requirement is sufficiently broad so as to have provided a great deal of latitude to Courts interpreting its provisions....

[A] plan satisfies 11 U.S.C. § 1129(a)(11) so long as there is a reasonable prospect for success and a reasonable assurance that the proponents can comply with the terms of the plan.... At bottom, it is clear that the feasibility inquiry is peculiarly fact intensive and requires a case by case analysis, using as a backdrop the relatively low parameters articulated in the statute. In this respect, however, it is clear that there is a relatively low threshold of proof necessary to satisfy the feasibility requirement.

*In re Eddington Thread Mfg. Co., Inc.,* 181 B.R. 826, 832–33 (Bankr.E.D.Pa.1995) (citations omitted).

In finding feasibility, the Bankruptcy Court rejected past performance as the sole reliable criterion of Appellee's future performance, and instead evaluated the changes effectuated by Appellee during the pendency of the bankruptcy and shortly prior to the confirmation hearing. *Id.* at 84–85. The Bankruptcy Court specifically noted that the past will not necessarily dictate the future when dealing with a Chapter 11 proceeding. *Id.* at 85. The court stated:

I think what the future will be is the extent to which the debtor has changed its ways. Now, sometimes the debtor changes its ways by learning how to operate better. Sometimes the debtor changes its ways by entering into a new environment, and this is the way this debtor did it. This debtor concentrated on raising that which had to be done to become eligible for the Social Service contract.... So, I find that under 1129(a) the plan is feasible based on the changes that are taking place and are the subject of sworn testimony.

*Id.*

In reaching this conclusion, the Bankruptcy Court relied heavily on the uncontradicted sworn testimony at the confirmation hearing in matters affecting feasibility, and concluded that Appellee's plan had a reasonable prospect of success. *Id.* at 82–85. In fact, the court specifically noted that Appellee's testimony regarding the changes effectuated during the bankruptcy "ha[d] not be [sic] contradicted." *Id.* at 84. With respect to Appellee's future performance, the Bank-

ruptcy Court determined that the recent changes to the Social Services Contract and the reduction of necessary payments to Appellant under the Plan provided a reasonable estimate of Appellee's future performance. *Id.* at 83–85.

In the matter *sub judice,* Appellant claims that Appellee's past performance during the Chapter 11 proceeding indicates that Appellee will be unable to implement its reorganization Plan in the future. *See* Appellant's Brief at 25–32. Specifically, Appellant notes that throughout the Chapter 11 case, the Debtor "was unable to even meet current operating expenses much less generate the surplus necessary to fund the Plan." *Id.* at 25. Appellant maintains that the Debtor failed to make $95,000.00 in post-petition real estate tax and water and sewer charge payments. In addition, according to Appellant, the Debtor was unable to make any monthly payments to Chemical, and it defaulted on its agreement to make interest-only payments of $537.00 to the holder of the tax sale certificate. *Id.* Moreover, Appellant claims that the Debtor will be required to make annual payments during the first three years of the plan of $113,192.00, not including interest owed on all claims except the claims of Chemical, while their net operating profit in 1994 was only $81,171.13. *Id.*

Despite Appellant's arguments to the contrary, however, this Court finds that Appellant's figures contain substantial flaws. Specifically, while Appellant asserts that Appellee must make a yearly payment to the Borough of $41,666.66 without interest, which represents Appellee's yearly payment toward the $250,000.00 of pre-petition real estate taxes and municipal charges, *see* Appellant's Brief at 26–27, this figure includes the $52,689.65 claim by Betty Simon, Trustee, the tax sale certificate holder. Debtor's Disclosure Statement at 5–6; Bankr.Hearing at 6. Thus, Appellee's yearly payment to the Borough under the Plan would be only $32,885.06 without interest, not $41,666.00 as alleged by Appellant. The total yearly payments under the Plan would likewise be reduced from $113,192.00 to $104,411.06.

Next, this Court finds unpersuasive Appellant's claims that the Social Services Con-

tract will not generate sufficient future income to support the required Plan payments. *See* Appellant's Brief at 28–30. Although Appellee began the Social Services Contract in September 1993, Appellee, through litigation, obtained the lifting of restrictions on the allowable number of occupants per room only three months prior to the confirmation hearing. Bankr.Hearing at 30–32. Appellee, who previously could service only two occupants per room in the off-season, now could house up to six occupants per room under the Social Services Contract. *Id.* Inasmuch as Appellee charges per occupant, it was reasonable for the Bankruptcy Court to conclude that the recent change in occupancy would cause Appellee's net cash flow to increase. *Id.* The Bankruptcy Court noted the likelihood of this increase by relying upon Michael Loundy's testimony that the Social Services Contract occupants reside at the Sea Garden Motel for seven days a week for up to three months per visit. *Id.* at 54–55. The likelihood of substantial increases in occupancy from a more stable client base certainly provides reasonable assurance of the implementation of Appellee's Plan.

Equally unavailing is Appellant's assertion that Appellee's monthly reports do not reflect such improved performance. Appellee's monthly reports ceased in May 1995, at the beginning of Appellee's operation without restriction, which commenced three months prior to the confirmation hearing. The Bankruptcy Court specifically took note of this fact in making its decision. *Id.* at 84. Moreover, the April 1995 and May 1995 reports do reflect a substantial net increase in cash flow over the April 1994 and May 1994 reports. Thus, the monthly reports justify the Bankruptcy Court's finding of "one month in a row" of improved performance. *Id.*

Appellant also contends that the cash flow projections appended to Appellee's disclosure statement do not identify the occupancy rates utilized for the cash flow projections. *See* Appellant's Brief at 30–31. However, Michael Loundy, who testified on behalf of Appellee, calculated in court the gross revenue at 100% occupancy to be $96,000.00. Bankr.Hearing at 42, 46, 77. This calculation

amply supports his prior testimony that the $64,000.00 of gross revenue projected for August 1995 reflected 65–70% occupance. *Id.*

More importantly, the Bankruptcy Court did not even rely upon the original cash flow projections in finding feasibility because their assumptions, such as the need for an additional monthly payment of $1,800.00 to Appellant, were not longer true. Specifically, the Bankruptcy Court noted:

> The projections have undergone some modifications during today's testimony, but I find as a matter of fact that the additional $1800 added to the projected cash flow covers any additional funds raised by the creditor here, including, specifically, that tax claim, that $500; and therefore, there appears to me to be plenty of cash flow. The cash flow projections were based on a 65 to 70 percent occupancy. The testimony is that August he anticipates either 100 percent or very close to 100 percent occupancy, and now with the other testimony concerning the Social Service contract, his occupancy rate should be significantly increased.

*Id.* at 252. Thus, the evidence clearly supports the Bankruptcy Court's reliance upon the cash flow projections as modified by Michael Loundy's testimony.

Appellant further argues that Appellee did not provide sufficient evidence to assure that the individual partners will make up any shortfalls in cash flow during the off-season. *See* Appellant's Brief at 31. However, Appellee notes that Michael Loundy testified to the commitment and present ability of the individual partners to make up any shortfall. Bankr.Hearing at 27–28, 42. During questioning by the court, Michael Loundy testified to his other sources of income to use for any shortfall. *Id.* at 53–54, 89. Appellant did not contradict this testimony, and the Bankruptcy Court properly accepted it. The Bankruptcy Court's conclusion regarding the partners' wherewithal to make up any shortfall is proper and supported by the uncontroverted evidence.

Finally, Appellant challenges the confirmability of Appellee's Plan because of the uncertainty of the Social Services Contract's renewal. *See* Appellant's Brief at 31. It is

well settled, however, that Appellee need not guarantee success, but merely demonstrate a reasonable assurance of success. *Eddington Thread Mfg.*, 181 B.R. at 832–33. Nonetheless, the Bankruptcy Court found any uncertainty surrounding the renewal of the Social Services Contract to be minimal. Specifically, the court stated:

> While there is no guarantee that it will be renewed when it expires next month, as Mr. Barkasy pointed out in his closing argument, nevertheless what this debtor said is: a) he's never heard of anybody whose wasn't renewed; b) there's a housing shortage; and c) he's now in Code compliance with everything necessary in order to be entitled to the renewal; and therefore he has—it isn't that it speculatively will be renewed. I think it's highly speculative that it wouldn't be renewed. . . .

Bankr.Hearing at 83. Therefore, the uncontradicted testimony of Michael Loundy clearly supports the Bankruptcy Court's belief that Appellee will obtain the renewal of the Social Services Contract, and thus, Appellant's argument is without merit. *Id.* at 16, 21–22, 28, 31.

In sum, a proper examination of the entire factual record clearly reveals ample support for the Bankruptcy Court's finding of feasibility under § 1129(a)(11). Accordingly, this Court finds that the Bankruptcy Court's finding of feasibility was not clearly erroneous.

### D. OBJECTIONS TO PROPOSED FORM OF ORDER

Appellant also claims that the Bankruptcy Court erred by entering the confirmation order submitted by Appellee's counsel on August 4, 1995, and asks this Court to vacate the order because (1) the Bankruptcy Court entered the order prior to the expiration of the local "five day rule"; and (2) because the order improperly fixes Appellant's secured and unsecured claims.

While it is true that the Bankruptcy Court entered Appellee's confirmation order on August 8, 1995, four days after its submission by Appellee's counsel and presumably prior to the Bankruptcy Court's receipt of Appellee's objection, Appellant provides no legal authority to support its position that such apparent error mandates the vacation of the order. In fact, this apparent error is harmless, and therefore, not reversible error. Federal Rule of Civil Procedure 61 provides that a court "at every stage of the proceeding must disregard any error or defect . . . which does not affect the substantial rights of the parties." Fed.R.Civ.P. 61. Therefore, unless the entry of Appellee's proposed order on the fourth day after its submission affects Appellant's substantial rights, this Court must not vacate it.

In the present matter, Appellant contends that this confirmation order affects its substantial rights because it allegedly fixes Appellant's claims improperly. However, the entry of Appellee's proposed order affected no substantial rights because Appellant failed to raise these substantive objections prior to or during the confirmation hearing. Local R.Bankr. 4(d) authorizes the filing and services of objections to the form of proposed orders, *i.e.*, whether the proposed order conforms to the Bankruptcy Court's oral ruling, for five days. It does not provide a mechanism for a litigant to raise for the first time substantive matters which the litigant should have raised at the proceeding which resulted in the order.

While reciting its findings and ultimate decision, the Bankruptcy Court specifically fixed Appellant's secured claim at $350,000.00 utilizing the figures presented at the hearing ($600,000.00 value minus $250,000.00 real estate taxes). In fact, the Bankruptcy Court indicated its belief that the parties had basically stipulated to this figure. Bankr.Hearing at 81. At no time did Appellant object to the Bankruptcy Court's finding or indicate its desire to have its secured claim determined with more precision. *Id.* at 89–91. Nor did Appellant present any testimony or other evidence to dispute the $250,000.00 tax estimate. *Id.* at 56. The Bankruptcy Court ruled on this substantive issue based on all of the evidence before it. Appellant's objection to the proposed order was an improper attempt to gain a second chance to make substantive objections not properly made in the first instance. This scheme does not comport with Local R.Bankr.P. 4(d) and provides

no basis for this Court to vacate the confirmation order.

Appellant makes the same argument with respect to its unsecured claim. However, the record for this appeal does not indicate that Appellant's total claim including pre-petition interest is $1,221,235.85. Appellant did not raise this issue at the confirmation hearing, but instead, waited until Appellee submitted the proposed form of order, thereby improperly seeking a second opportunity to assert its position in the guise of an objection to form. Objection to Proposed Form of Order of Order Confirming Chapter 11 Plan, Aug. 8, 1995, attached to Appellant's Appendix at 268. Inasmuch as Appellant had no right to utilize Local R.Bankr.P. 4(d) to raise these substantive objections, the apparent premature entry of the confirmation order did not affect Appellant's substantial rights and is, therefore, harmless error not appropriate for consideration by this Court.

### E. RELIEF FROM AUTOMATIC STAY

▮ Finally, Appellant requests that this Court immediately lift the automatic stay to permit Appellant to foreclose on its mortgage on Appellee's property if this Court reverses the Bankruptcy Court's confirmation order. To obtain relief from the automatic stay, Appellant must first satisfy 11 U.S.C. § 362(d)(2), which requires a demonstration that: (1) there is no equity in the property, and (2) the property is not necessary for an effective reorganization. Whether property is necessary for an effective reorganization requires an examination of whether there is "a reasonable possibility of a successful reorganization within a reasonable time." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 376, 108 S.Ct. 626, 632–33, 98 L.Ed.2d 740 (1988). Thus, Appellant would not be entitled to relief from the automatic stay if there are reasonable prospects of a successful reorganization. *Id.* However, while this Court has vacated in part the confirmation order, we cannot undertake the task of determining whether Appellee could still confirm a reorganization plan in light of our ruling. Accordingly, this Court must vacate the August 7, 1995 Order Denying Motion for Relief from the Automatic Stay and remand this issue to the Bankruptcy Court for reconsideration in light of this opinion and order.

### III. CONCLUSION

For the foregoing reasons, this Court will affirm in part and reverse in part the Bankruptcy Court's August 8, 1995 Order Confirming Chapter 11 Plan and vacate and remand the August 7, 1995 Order Denying Motion for Relief from the Automatic Stay.

### ORDER

For the reasons set forth in this Court's Memorandum Opinion,

IT IS this 20th day of February, 1996,

ORDERED that the Bankruptcy Court's August 7, 1995 Order Denying Motion for Relief from the Automatic Stay be and is hereby VACATED and REMANDED; and it is further

ORDERED that the Bankruptcy Court's August 8, 1995 Order Confirming Chapter 11 Plan be and is hereby REVERSED and REMANDED to the extent that the Bankruptcy Court failed to consider whether the partners' new value contribution satisfied the "substantiality requirement" of the "new value exception"; and it is further

ORDERED that the Bankruptcy Court's August 8, 1995 Order Confirming Chapter 11 Plan be and is hereby REVERSED and REMANDED to the extent that the Bankruptcy Court included the $25,000.00 contribution from the Debtor's operating account, rather than the partners, in its calculation of the amount of the new value contribution to be paid under the Plan for Reorganization; and it is further

ORDERED that the Bankruptcy Court's August 8, 1995 Order Confirming Chapter 11 Plan be and is hereby REVERSED and REMANDED to the extent that the Bankruptcy Court found that the partners' capital contribution was reasonably equivalent to the value of the partnership interest in the reorganized Debtor; and it is further

ORDERED that the Bankruptcy Court's August 8, 1995 Order Confirming Chapter 11

Plan be and is hereby AFFIRMED to the extent that the Bankruptcy Court included the $43,000.00 contribution from the Debtor's repairs of the motel in its calculation of the amount of the new value contribution to be paid under the Plan for Reorganization; and it is further

ORDERED that the Bankruptcy Court's August 8, 1995 Order Confirming Chapter 11 Plan be and is hereby AFFIRMED to the extent that the Bankruptcy Court permitted Adele Loundy to retain an equity interest in the Debtor; and it is further

ORDERED that the Bankruptcy Court's August 8, 1995 Order Confirming Chapter 11 Plan be and is hereby AFFIRMED to the extent that the Bankruptcy Court found that the Debtor's Plan for reorganization was "feasible".